**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| SHERIDAN HOLDING COMPANY I, LLC, *et al.*,[1] | § | Case No. 20-31884 (DRJ) |
|  | § |  |
| Debtors. | § | (Joint Administration Requested) |
|  | § |  |

**DECLARATION OF LISA A. STEWART, EXECUTIVE
CHAIRMAN, PRESIDENT, CHIEF INVESTMENT OFFICER, AND
CHIEF EXECUTIVE OFFICER OF SHERIDAN HOLDING COMPANY I, LLC,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Lisa A. Stewart, hereby declare under penalty of perjury:

1.     I serve as the Executive Chairman, President, Chief Investment Officer, and Chief Executive Officer of Sheridan Holding Company I, LLC ("Holdco I") and certain of its affiliate debtors and debtors in possession (each of the debtors, the "Debtors" or "Sheridan I," and together with their non-Debtor affiliates, the "Sheridan Group").  I have served as President and Chief Executive Officer and/or Executive Chairman and Chief Investment Officer since the Sheridan Group's founding in 2006.  I oversee the Sheridan Group's day-to-day operations, including the implementation of the Sheridan Group's strategy.

2.     Prior to founding the Sheridan Group, I served as an Executive Vice President of El Paso Corporation ("El Paso") and President of El Paso E&P and other non-regulated businesses. Prior to my time at El Paso, I spent 20 years at Apache Corporation, leaving in 2004 as Executive

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sheridan Holding Company I, LLC (7648); Sheridan Investment Partners I, LLC (8607); Sheridan Production Partners I, LLC (8094); Sheridan Production Partners I-A, L.P. (8100); Sheridan Production Partners I-B, L.P. (8104); Sheridan Production Partners I-M, L.P. (8106); and SPP I-B GP, LLC (8092).  The location of the Debtors' service address is:  1360 Post Oak Blvd., Suite 2500, Houston, Texas 77056.

Vice President with responsibility for reservoir engineering, business development, land, environmental, health and safety, and corporate purchasing.  I hold a Bachelor of Science degree in Petroleum Engineering from the University of Tulsa where I am a member of the College of Engineering and Natural Sciences Hall of Fame.  I am also a member of the Society of Petroleum Engineers.

3.     To effectuate a restructuring, on the date hereof (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas (the "Court").  To minimize the adverse effects on their businesses, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

4.     I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Introduction and Overview

**I.    Preliminary Statement**

5.    The Debtors commenced these chapter 11 cases to implement this restructuring through a prepackaged plan of reorganization (the "Plan"), a copy of which has been filed contemporaneously herewith.  The Plan reduces the Debtors' prepetition debt by approximately $470 million, deleverages their balance sheet, provides a four-year path for an orderly disposition of the Debtors' oil and gas assets, and leaves trade creditors unimpaired.

6.    Sheridan I is seeking to have its plan confirmed at the first-day hearing.  The Debtors have received unanimous support for the Plan, which has been accepted by 100 percent of creditors that cast ballots.  No creditor has voted to reject the Plan, and approximately 97 percent by principal amount of impaired creditors submitted ballots.  In addition, and through its advisors, the Debtors have taken all appropriate procedural steps to provide sufficient notice to all stakeholders of their bankruptcy and the confirmation of their Plan.  Based on the notice process described below, all of the Debtors' stakeholders are or should be aware that the Debtors are seeking confirmation of the Plan at the first day hearing.  No party in interest has objected to the Plan.

7.    On February 21, 2020, Sheridan I commenced solicitation of votes on the Plan and provided actual notice of the Plan and the disclosure statement in support of the Plan (the "Disclosure Statement) to voting creditors, Sheridan I's limited partners, the top fifty (50) general unsecured creditors, interested government parties, and core notice parties.  On the same day, Sheridan I mailed the notice of combined hearing (the "Combined Hearing Notice") to approximately 21,000 creditors and interested parties and posted the Plan, Disclosure Statement, and Combined Hearing Notice to Sheridan I's proposed notice and claims agent's website at: https://cases.primeclerk.com/sheridanballots.  The Combined Hearing Notice explicitly stated that

Sheridan I would request that the Court confirm its prepackaged Plan at the first day hearing, on March 24, 2020 at 2:30 p.m. prevailing central time before either Judge David R. Jones or Judge Marvin Isgur and that the proposed objection deadline for the Plan and Disclosure Statement was March 20, 2020 at 4:00 p.m. prevailing central time. Notice was also published in the *New York Times* (national edition), on February 24, 2020, and the *Houston Chronicle*, on February 25, 2020.

8. Importantly, the Plan does *not* impair any creditors, other than the parties that have overwhelmingly voted in favor of the Plan and the current limited partners. As a result, all general unsecured claims are riding through the bankruptcy and will be paid in the ordinary course of business. All contracts and leases will be assumed and are riding through the bankruptcy. The Debtors have also provided the ability for all Releasing Parties under the Plan to opt out of the releases under the Plan by checking the opt-out box on their applicable ballot or opt-out form.

9. Unsurprisingly due to the ride-through nature of the Plan, no party in interest has objected to the Plan. The Debtors have received informal comments to the Plan from various parties and have resolved these potential objections through the inclusion of language in the confirmation order. Of the more than 20,000 parties who received an opt-out form, 281 elected to opt out of the releases under the Plan. In short, the Debtors' prepetition noticing efforts worked, and the Debtors are poised to confirm a truly consensual Plan.

10. It is in the best interest of the estates that the Debtors remain in bankruptcy for as short a time-period as possible. The Plan provides that the Reorganized Debtors will transition to a new management team following Sheridan I's emergence from bankruptcy. In connection with the recent chapter 11 cases of the Debtors' affiliates, Sheridan Holding Company II, LLC and certain of its affiliates (collectively, "Sheridan II"), Sheridan II is also transitioning operation of its assets to a new management team following a brief transition period that expires on March 31, 2020 (subject to the continued provision of certain accounting and regulatory reporting

functions through April 30, 2020).  As described below, the Debtors and Sheridan II do not have their own employees, who are instead employed by a non-Debtor affiliate, Sheridan Production Company, LLC ("SPC"), which provides services on behalf of the Debtors and Sheridan II.  Due to the end of the Sheridan II transition period, it is anticipated that SPC will make significant workforce reductions on or around March 31, 2020.  Following these reductions, SPC's capacity to provide transition services to the Reorganized Debtors will either be significantly reduced or will require the Debtors to incur significant increased personnel costs.  Accordingly, it is critical that the Debtors emerge from these chapter 11 cases as quickly as possible to provide for an orderly transition to new management in advance of the March 31 deadline.

11.     As further described in **Exhibit A** herein, on the Petition Date the Debtors have filed a variety of "first-day" motions requesting necessary operational and procedural relief to allow the Debtors to continue to operate their business in the ordinary course.  Although the Debtors anticipate emerging from these chapter 11 cases as soon as possible following the Petition Date, the Debtors have requested customary first-day relief out of an abundance of caution in the event confirmation or consummation of the Plan is delayed.

12.     The Debtors' restructuring pursuant to the Plan will result in a substantial deleveraging of the Debtors' balance sheet by approximately $470 million (representing approximately 75 percent of their funded debt obligations), transition the Debtors to a new holding structure owned by the secured lenders, and monetize the Debtors' asset portfolio through an orderly, value-maximizing wind-down process, while leaving all other creditors unimpaired. Therefore, the Debtors respectfully request that the Court grant the relief requested in the First Day Motions, approve the Disclosure Statement, and confirm the Plan, allowing the Debtors to emerge from these cases as quickly as possible.

## II.     Restructuring Background.

13.     The Debtors are an oil and natural gas investment fund with a principal focus on exploiting a balanced portfolio of working interests in mature producing properties in onshore basins in the United States.  The Debtors' strategy includes the application of cost-effective reinvestments, operational improvements, and enhanced recovery programs to the acquired assets. The downturn and continued weakness in the commodities markets, however, has hindered the Debtors' ability to implement their strategy.  For the year ending December 31, 2019, the Debtors reported $116 million of total revenue.

14.     As of December 31, 2019, the Debtors have approximately $616.1 million of funded debt, consisting of the following facilities of Sheridan Investment Partners I, LLC ("SIP I"), Sheridan Production Partners I-M, L.P. ("SPP I-M"), and Sheridan Production Partners I-A, L.P. ("SPP I-A" and, together with SIP I and SPP I-M, the "Sheridan I Borrowers"):

- three first-lien revolving credit facilities with approximately $167.1 million in aggregate principal outstanding (the "Sheridan I RBL Facilities"); and
- three first-lien term loan credit facilities with approximately $449.0 million in aggregate principal outstanding, which share an equal lien with the Sheridan I RBL Facilities (the "Sheridan I Term Loan Facilities").

The Debtors used funds from the Sheridan I RBL Facilities and the Sheridan I Term Loan Facilities, together with equity commitments from limited partners (the "Limited Partners"), to acquire oil and gas producing properties located in Oklahoma, Texas, and Wyoming.

15.     The Debtors are part of the broader Sheridan Group, which was established in 2006 by a seasoned team of oil and gas executives with Warburg Pincus LLC ("Warburg Pincus"), a private equity firm, as the co-sponsor.  Headquartered in Houston, Texas, Sheridan I comprises the first of three series of private-placement investment funds managed by Sheridan Production Partners Manager, LLC ("Manager").  Sheridan I consists of three sub-funds, each intended for a

different type of investor:  taxable entities; tax-exempt entities; and members of Warburg Pincus and the Sheridan Group management team.

16.     SPC, a subsidiary of Manager, serves as the contract operator of the Debtors' properties.  In that capacity, SPC performs all services with respect to the operation of the Debtors' properties, including but not limited to, drilling, testing, completion and operation of the wells operated by the Debtors, and procurement of drilling rigs, equipment, supplies, and other services as may be necessary for the operation and supervision of the contractors and vendors providing such equipment and services.  SPC is the counterparty to office leases, as well as certain contracts, licenses, surface use agreements, easements and other agreements used in operation of the Debtors' properties.

17.     Over the past years, the Debtors have taken steps to avoid a chapter 11 filing, even while many other oil and gas companies have pursued in-court restructurings.  To stave off an impending liquidity crisis, the Debtors took a proactive approach to the market challenges facing the oil and gas industry.  This included comprehensive efforts to decrease lease operating expenses and general and administrative expenses while controlling capital expenditures and pursuing strategic asset sales.

18.     Recognizing the need for a long-term solution, however, in late 2018 the Debtors retained Kirkland & Ellis LLP and Evercore to explore strategic alternatives, including a comprehensive restructuring.  In early 2019, the Debtors also retained AlixPartners, LLP as restructuring advisor.  Beginning in late 2018, the Debtors began negotiations with the lenders under the Sheridan I RBL Facilities (the "Sheridan I RBL Lenders") and the lenders under the Sheridan I Term Loan Facilities (the "Sheridan I Term Lenders" and, together with the Sheridan I RBL Lenders, the "Lenders") regarding certain limited waivers under their secured credit facilities and a potential out-of-court restructuring transaction.  Ultimately, negotiations regarding the

potential out-of-court transaction proved to be unsuccessful, and the Debtors' prepetition efforts did not provide a long-term solution to their liquidity crisis. As detailed below, the Debtors' current debt load is unsustainable, particularly when compared to that of their competitors. A substantial balance sheet deleveraging is necessary to allow the Debtors to withstand the current commodity price volatility and to continue to maximize the value of their oil and gas properties.

19.     Accordingly, beginning in mid-2019 and continuing through the date of solicitation, the Debtors and Lenders engaged in hard-fought, good-faith negotiations around the terms of the Plan. These efforts culminated on February 27, 2020, with the execution of a restructuring support agreement (the "RSA"), attached hereto as **Exhibit C**. As a result of these efforts, the Debtors have commenced these cases with a Plan that enjoys overwhelming stakeholder support: 100% of voting creditors have voted in favor with the Plan, with 93% of Sheridan I RBL Lenders and 99% of Sheridan I Term Lenders by amount submitting votes in favor of the Plan. The Plan contemplated by the RSA would implement a comprehensive restructuring that would equitize a significant portion of the Debtors' funded debt obligations and substantially delever their balance sheet. Specifically, the Plan provides for:

- The Debtors' secured lenders to receive (i) their *pro rata* share of 100% of new equity, subject to dilution on account of the warrants, (ii) their *pro rata* share of a $150 million term exit facility, and (iii) cash, if any, in excess of $20 million (subject to certain adjustments) on the Debtors' balance sheet as of the effective date of the plan;

- all other creditors to be either paid in full or to receive such treatment that will render their claims unimpaired; and

- limited partners who do not opt out of the mutual and consensual releases granted under the plan to receive warrants for 20% of new equity on a fully-diluted basis, which may be exercised once the Lenders have received distributions equal to the outstanding debt as of the Petition Date plus certain enhanced economics.

20.     With a fully solicited Plan in hand supported by virtually all holders of the Debtors' funded debt, it is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from these chapter 11 cases. A prolonged stay in chapter 11 would endanger the

Debtors' ability to provide an orderly transition of their assets and would only result in significant incremental administrative costs.  The Plan and RSA set forth a clear pathway to emergence.  The Debtors believe the transactions embodied in the Plan will leave the reorganized enterprise with a considerably diminished debt load and well-positioned to compete in the upstream market.

21.     To familiarize the Court with the Debtors' businesses, this declaration has been organized into five sections.   The *first* provides background information on the Debtors' businesses and operations.   The *second* offers detailed information on the Debtors' capital structure.  The *third* describes detailed information on the Debtors' corporate structure and their intercompany transactions.  The *fourth* details the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts, including the relevant terms of the Debtors' RSA.  The *fifth*, together with **Exhibit A**, summarizes the relief requested in, and the legal and factual basis supporting, the First Day Motions.

## Discussion

**III.     Background of the Debtors' Businesses and Operations.**

**A.     The Sheridan Group's History.**

22.     Manager was established in 2006 with the long-term plan of creating a premier oil and gas operating company.  Since its inception, Manager has raised $4.6 billion in equity capital commitments across its three series of funds, primarily from institutional investors, with an objective to acquire a balanced portfolio of oil and gas properties, operate them for a specified period of time, and divest of the assets with a substantial return on their original investment.  Sheridan I was formed in 2007 and raised approximately $1.3 billion in equity commitments.  Following the successful implementation of Sheridan I's acquisition strategy, Manager raised its second series of funds, Sheridan II, in 2010.  Sheridan II raised equity commitments of $1.8 billion.  Sheridan II was founded on the same principles as Sheridan I and continued the Sheridan Group's

strategy of employing a combination of equity commitments and debt financing to purchase oil and gas producing assets. In 2013, Manager raised a third series of funds ("Sheridan III"), which raised a total of approximately $1.5 billion in equity commitments. Many of the Limited Partners that invested in Sheridan III were repeat investors who had previously invested in Sheridan I and Sheridan II. Three series of Sheridan funds collectively completed nine major acquisitions for an aggregate purchase price of $5.7 billion.

23.     The Debtors consist solely of entities that comprise—and which operate as a part of—Sheridan I. Since their inception in 2007, the Debtors have completed six major asset acquisitions, investing 100% of commitments from their Limited Partners to fund acquisition costs, operations, management fees, and other expenses. During the lifetime of the Debtors, approximately $1 billion has been reinvested to enhance and maintain production from the acquired properties, and $864 million, or 66% of capital commitments, has been distributed to their Limited Partners. No distributions have been made by the Sheridan I Borrowers since 2014.

24.     As a result of these investments, the Debtors own interests in oil and gas properties in four geographical areas: the Gulf Coast, the Mid-Continent, the Permian, and the Rocky Mountains. The majority of the Debtors' oil and gas properties are operated by SPC.

**B.     Sheridan I's Businesses.**

25.     Sheridan I's business strategy is to invest in oil and gas properties, seeking to build value through capital reinvestment, operational improvements, and enhanced recovery, while focusing on cost control. The Debtors primarily conduct their exploration and production ("E&P") activities through Holdco I, which holds legal title to working interests in oil and gas properties for the benefit of SPP I-A and SPP I-M, and through SPC, which operates the properties. Through oil and gas leases entered into with mineral rights owners, Holdco I holds the right to drill, rework, operate, produce and maintain oil and gas wells. The Debtors' produced hydrocarbons are

typically either sold at the wellhead or transported by pipeline or truck for processing and/or sale to purchasers.  After receipt of proceeds, SPC, on behalf of the Debtors, distributes funds to various working interest holders, royalty interest holders, taxing authorities, and other parties with an interest in production.  The remaining proceeds are retained as operating revenues and are utilized for payment of operating expenses, reinvestment in the assets or debt service.

   1.   **Asset Acquisitions.**

26.   Since the Debtors' inception, the Debtors have executed six major acquisitions across several basins.  Each of those transactions is described below:

- *Sage Energy Acquisition.*   On July 9, 2007, Holdco I executed a definitive agreement to purchase from Sage Energy Company and Sage Master, LLC certain oil and natural gas properties in the Permian Basin and Austin Chalk play area for $155 million.  The transaction had an effective time of July 1, 2007 and closed on August 31, 2007.  On August 31, 2007, Holdco I also executed and closed a definitive agreement to purchase from George G. Staley certain oil and natural gas assets in the Permian Basin for $8.7 million, with an effective time of September 1, 2007.  The two transactions combined are collectively referred to as the "Sage Energy Acquisition".  As of this date all of the properties except the Austin Chalk assets have been divested.

- *Aethon I LP Acquisition.*   On November 2, 2007, Holdco I executed a definitive agreement to purchase from Aethon I LP certain oil and natural gas properties in the Permian Basin and in Oklahoma for $780 million.  The transaction had an effective time of September 1, 2007 and closed on November 30, 2007.  Assets acquired consisted of twelve mature oil fields located in the Permian Basin of Texas and in Southern Oklahoma.

- *S. Texas and WHGU Acquisition*.   On August 5, 2009, Holdco I executed a definitive agreement to purchase from Smith Production Inc. certain oil and natural gas properties in South Texas for $163 million.  The transaction had an effective time of September 1, 2009 and closed on September 15, 2009.  Holdco I also executed definitive agreements with ten non-operated working interest partners in the West Howard Glasscock Unit ("WHGU") in the Permian basin to purchase their interests for $47 million, in the aggregate, with all of these transactions also closing on September 15, 2009.  As of this date, only the WHGU interests remain in the portfolio.

- *Exco Resources, Inc. Acquisition.*   In October 2009, Holdco I and Exco Resources, Inc. ("EXCO") announced a definitive agreement where EXCO sold certain producing oil and natural gas assets located in Oklahoma to Holdco I for approximately $540 million.  The transaction had an effective date of October 1, 2009, and closed on November 10, 2009. The acquired properties consisted

primarily of gas-focused assets in the Mocane-Laverne and the South Central Oklahoma Oil Play ("SCOOP") regions in Oklahoma.

- ***Juno Energy, LLC Acquisition.*** On April 29, 2011, the Sheridan Group acquired two waterflood units located in Crosby and Lubbock Counties, Texas from Juno Energy, LLC and other sellers for an aggregate adjusted purchase price of approximately $328 million (approximately $219 million net to Sheridan I). An undivided two-thirds interest in the assets was acquired by Sheridan I, and the remaining one-third interest was acquired by Sheridan II. Sheridan I, acting through SPC as contract operator, is the operator of the properties, and Sheridan II holds a non-operated interest in the properties.

- ***El Paso E&P Acquisition***. On August 4, 2011, the Sheridan Group acquired certain oil and gas properties located in the Powder River Basin in Campbell County, Wyoming, from El Paso E&P Company for an aggregate adjusted purchase price of approximately $356 million (approximately $239.4 million net to Sheridan I). An undivided two-thirds interest in the assets was acquired by Sheridan I, and the remaining one-third interest was acquired by Sheridan II. Sheridan I, acting through SPC as contract operator, is the operator of the properties, and Sheridan II holds a non-operated interest in the properties.

### 2. Current Operations.

27. As of December 31, 2019, Sheridan I owned interests in approximately 1,663 gross producing wells, a substantial majority of which are operated by Sheridan I through SPC as its contract operator. Ownership includes assets in Oklahoma, Texas and Wyoming, which are organized into four geographic districts. Approximately 49% of the production from the assets is oil and condensate, and the remainder is natural gas. The net production of the Debtors' assets, by area, in the fourth quarter of 2019 was:

| Location | Oil (BOPD) | Gas (MCFD) | Total (BOE) | Well Count |
|---|---|---|---|---|
| Gulf Coast District | 443 | 1,815 | 746 | 88 |
| Mid-Continent District | 1,337 | 21,986 | 5,001 | 1,199 |
| Permian District | 2,090 | 5,015 | 2,926 | 265 |
| Rocky Mountain District | 725 | 0 | 725 | 111 |
| **Total Amount Held by Sheridan I** | **4,595** | **28,816** | **9,398** | **1,663** |

28. As noted, the Debtors primarily conduct their business operations in the "upstream" sector, meaning their operations consist of E&P operations for the capture and sale of oil and natural gas. Their E&P operations produce from domestic, onshore hydrocarbon basins through

oil and natural gas leases entered into with mineral rights owners in the regions in which the Debtors conduct business. Certain of the Debtors hold working interests in oil and gas properties that give them the right to drill and maintain wells in the applicable geographic areas.

29.     SPC, as the entity contracted by the Debtors to operate their assets, conducts the day-to-day business of drilling, reworking, operating, producing, and maintaining the Debtors' oil and natural gas wells. In that capacity, SPC employs personnel and contracts with third parties to provide goods and services necessary to operate the Debtors' properties. The Debtors cover the expenses associated with those operations. To the extent subject to a joint operating agreement, unit agreement, pooling order, or similar agreement, any other owners of working interests in the oil and gas properties advance or reimburse SPC for their proportionate share of the cost of the operations. Debtors' produced hydrocarbons are typically either sold at the wellhead or transported by pipeline or truck for processing and/or sale to purchasers.

30.     In instances where the Debtors own undivided interests in oil and natural gas leases, but do not act as operator, a third-party will serve as the operator of the properties. As non-operators, the Debtors may either elect to take their share of production in kind or have the operator of the property market their share of production on their behalf. Where the operator markets production on behalf of the Debtors, the operator distributes proceeds of such sale to the Debtors. In addition, the operator invoices the Debtors for their share of operating expenses and capital investment. The Debtors' non-operated interests are material, but constitute a minority of the Debtors' business, accounting for approximately 5% of the Debtors' total estimated proved reserves as of June 30, 2019.

## IV.     Debtors' Prepetition Corporate and Capital Structure.

31.     Limited Partners of Sheridan I invested in one of three Debtor entities: SPP I-A, Sheridan Production Partners I-B, L.P. ("SPP I-B"), or SPP I-M. SPP I-A and SPP I-M acquired

working interests in oil and gas properties; SPP I-B purchased net profits overriding royalty interests carved out of SPP I-M's working interest.  SPP I-A and SPP I-M incurred loans to finance a portion of the costs of their acquisitions.  SPP I-B is not a borrower and has no debt.  SPP I-B, however, sold preferred equity to SIP I, the proceeds of which were utilized to fund a portion of the purchase price paid by SPP I-B for the net profits overriding royalty interests purchased from SPP I-M.  SIP I incurred loans to finance the purchase price paid for the preferred equity.  The Sheridan I Borrowers are each borrowers under separate reserve-based and term loan facilities.

32.     As of December 31, 2019, the Debtors have approximately $616.1 million of outstanding principal on their funded debt obligations.  This consists of $167.1 million under the Sheridan I RBL Facilities and $449.0 million under the Sheridan I Term Loan Facilities.  The Debtors' aggregate debt load is depicted in the table below.

| Funded Debt | Maturity | Outstanding Principal Amount as of December 31, 2019 |
|---|---|---|
| Sheridan I RBL Facilities | May 6, 2019 | $167.1 million |
| Sheridan I Term Loan Facilities | October 1, 2019 | $449.0 million |
| | **Total Funded Debt** | $616.1 million |

33.     The following table depicts the current distribution of the Debtors' debt load across SIP I, SPP I-A, and SPP I-M:

| | Sheridan I RBL Facilities | | Sheridan I Term Loan Facilities | |
|---|---|---|---|---|
| | *Outstanding Principal* | *Maturity* | *Outstanding Principal* | *Maturity* |
| **SIP I** | $137.7 million | 5/6/19 | $370.0 million | 10/1/19 |
| **SPP I-A** | $18.2 million | 5/6/19 | $49.0 million | 10/1/19 |
| **SPP I-M** | $11.1 million | 5/6/19 | $30.0 million | 10/1/19 |
| *Total Commitments* | $167.1 million | | $449.0 million | |

A.      **Secured Debt Obligations.**

1.      **The Sheridan I RBL Facilities.**

34.     SIP I, SPP I-M, and SPP I-A, as borrowers, and Bank of America, N.A. ("Bank of America"), as administrative agent and collateral agent, and the lenders party thereto are each party to one of three credit agreements dated as of April 20, 2010 (as such have been amended, amended and restated, or otherwise modified from time to time prior to the date hereof, collectively, the "Sheridan I RBL Credit Agreements"). The Sheridan I RBL Credit Agreements allow SIP I to access approximately $137.7 million in revolving credit commitments, SPP I-M to access approximately $11.1 million in revolving credit commitments, and SPP I-A to access approximately $18.2 million in revolving credit commitments. The obligations under the Sheridan I RBL Facilities are secured by first-priority liens in substantially all of the Sheridan I Borrowers' assets, including, among other things, equity pledges in the borrower's assets, oil and gas assets, and control agreements on bank accounts. As of December 31, 2019, in the aggregate, approximately $167.1 million remains outstanding under the Sheridan I RBL Facilities, leaving no availability for additional borrowings. The maturity date of each of the Sheridan I RBL Facilities was May 6, 2019, and the Sheridan I RBL Lenders and Sheridan I Borrowers are currently under a forbearance with regards to the maturity date.

2.      **The Sheridan I Term Loan Facilities.**

35.     SIP I, SPP I-M, and SPP I-A, as borrowers, and Ankura Trust Company, LLC, as successor administrative agent to UBS AG, Stamford Branch, as collateral agent, and the lenders party thereto are each party to one of three credit agreements dated as of October 1, 2012 (as such have been amended, amended and restated, or otherwise modified from time to time prior to the date hereof, collectively, the "Sheridan I Term Loan Credit Agreements"). The Sheridan I Term Loan Credit Agreements provide for three senior secured first-lien term loans with substantially

the same collateral package and are *pari passu* with the Sheridan I RBL Facilities.  As of December 31, 2019, approximately $449.0 million in aggregate principal amount remained outstanding under the Sheridan I Term Loan Facilities.  The maturity date for the Sheridan I Term Loan Facilities was October 1, 2019, and the Sheridan I Term Lenders and Sheridan I Borrowers are currently operating under a forbearance with regards to the maturity date.

> **B.      Hedging Obligations.**

36.      The Sheridan I Borrowers maintain a very small hedge portfolio intended to modestly insulate revenues against negative changes in oil basis differentials (the "Prepetition Hedging Arrangements").  Currently, the Debtors' Prepetition Hedging Arrangements remain with one counterparty who is a Sheridan I Revolving Lender.  The obligations under the Prepetition Hedging Arrangements are equal in priority to the obligations under, and are secured by equal liens in the collateral under, the Sheridan I RBL Facilities.  As of the date hereof, the remaining outstanding trades consist of a Midland/Cushing basis swap for 300 bbls/d struck at $(1.34) throughout 2020.

## V.      Debtors' Corporate Structure and Intercompany Transactions.

37.      The chart below depicts the Debtors' current corporate structure, which is also attached hereto as **Exhibit B**:



38.     The Debtors' corporate structure was designed to accommodate the different needs of a diverse group of investors.  The Debtors' oil and gas assets are held by Holdco I, which holds bare legal title to the assets for the benefit of SPP I-M and SPP I-A.  SPP I-M, SPP I-A, and SPP I-B are the fund-level entities through which the Limited Partners have invested in Sheridan I. Each of these entities was formed for a different subset of the Limited Partners.   The Limited Partners who contributed to SPP I-A generally consist of taxable entities, and the Limited Partners who contributed to SPP I-B generally consist of tax-exempt entities.  The Limited Partners who contributed to SPP I-M generally consist of current and former executives, directors, principals and investment professionals of the Manager and its non-debtor affiliate, SPC, as well as members of Warburg Pincus.  Use of separate investment vehicles in this manner is typical amongst private funds similar to the Debtors because tax-exempt and taxable investors operate under different tax rules, laws, and regulations.  Due to this structure, SPP I-B is not a borrower

and has no debt.  As noted above, however, SPP I-B sold preferred equity to SIP I, the proceeds of which were utilized to fund a portion of the purchase price paid by SPP I-B for a net profits overriding royalty interest purchased from SPP I-M.

**VI.    Events Leading to the Chapter 11 Filing.**

     **A.    Market and Industry-Specific Challenges.**

39.    Oil and natural gas prices have declined substantially since 2014.  The difficulties faced by the Debtors are consistent with those faced industry-wide.  Historically, the markets for oil, natural gas and natural gas liquids ("NGLs") have been volatile, and they likely will continue to be volatile, especially given current geopolitical and economic conditions.  Among the factors causing such volatility are the domestic and foreign supply of oil and natural gas, the ability of members of the Organization of Petroleum Exporting Countries ("OPEC") to comply with the agreed upon production cuts and the cooperation of other producing countries to reduce production levels, social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, and the levels and growth of domestic and global economic activity.  In particular, the U.S. "Shale Revolution"—the implementation of horizontal drilling and hydraulic fracking techniques to unlock oil and natural gas from previously non-producible shale formations—has resulted in a dramatic increase in U.S. crude oil and natural gas production, greatly increasing supplies at a time of uncertain demand.  Although prices have recovered somewhat from their lows at the beginning of 2016, NYMEX futures curves for both natural gas and crude oil indicate an expectation among traders in the derivatives market that these commodity prices are expected to decline over the next several years.

*Decline of Oil and Gas Prices Over Time*

**West Texas Intermediate ("WTI") Crude Oil Closing**

**Natural Gas Henry Hub Prices**



40.    These market conditions have affected oil and gas companies at every level of the industry around the world.  Although all companies in the oil and gas industry have been affected at some level, independent oil and gas companies such as Sheridan I have been especially hard hit, as their revenues primarily are generated from the sale of unrefined oil, natural gas, and NGLs. Hundreds of oil and gas companies have filed for chapter 11 since the beginning of 2015, including, most recently, Sheridan II, Alta Mesa Resources, Halcon Resources, Legacy Reserves, White Star Petroleum, Vanguard Natural Resources, Inc., Rex Energy Corporation, EV Energy Partners, LP, Fieldwood Energy LLC, Stone Energy Corporation, Parker Drilling Company, Gastar Exploration, Inc., EXCO Resources, Inc., Bonanza Creek Energy, Inc., Memorial Production Partners LP, Seadrill Limited, and Cobalt International Energy Inc.  Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.

The current volatility in the commodity markets has made it especially difficult for some companies to execute on any viable out-of-court restructuring alternatives.

**B.    Debtors' Efforts to Address Liquidity Issues.**

41.    The Debtors were not immune to these macroeconomic forces.  From the beginning of the downturn, the Debtors took steps to reduce expenditures.  These efforts included a move to less expensive office space, as well as various other measures to reduce general and administrative costs and streamline operations, including implementation of initiatives to reduce costs of:  salaries and benefits; information and technology; tax, legal, engineering, and audit expenses; and occupancy and insurance expenses.

42.    Nevertheless, the Debtors recognized that cost savings alone would not insulate them from the depressed commodities market and shifted focus to divesting assets located in the SCOOP as the 2019 maturity date of the Sheridan I RBL Facilities closed in.  In late 2017, the Debtors went to market with assets in the SCOOP due to a burst of industry activity in the area and perceived salability of the Debtors' large 29,000 net acre position.  After nearly a year in the market, a Purchase and Sale Agreement ("PSA") was signed in mid-October 2018 that provided for a mid-December closing and a purchase price significantly above the borrowing base contribution of the assets.  One week before closing, however, the Debtors were informed that the buyer would be unable to close due to lack of financing in breach of the PSA.  The buyer's inability to secure financing paralleled a sharp drop in oil prices in the fourth quarter of 2018 triggered by rising inventory levels and continued U.S. production growth.  In an effort to consummate the sale, the closing date was extended to January 18, 2019.  However, the buyer remained unable to close, and the deal ultimately collapsed.

43.    Although oil prices improved significantly during the first three quarters of 2018 with WTI ultimately reaching a high of $74.96 in October 2018, over the next two months, prices

retreated significantly, giving back much of the gains since 2016. Furthermore, due to takeaway capacity constraints, the West Texas Sour ("WTS") differential hit a low in September of 2018 at $16.21/Bbl, significantly worse than the historical average for the posting. Approximately 40% of the Debtors' assets are subject to either WTS or Midland-Cushing basis differentials. The Debtors have been able to mitigate some of the impact through basis hedges. However, the Debtors' substantial commodity price hedge position also limited their ability to protect margins because the Debtors were unable to take advantage of any upward movement in spot prices during the year. As a result of these factors and the inability of the Debtors to close the sale of the SCOOP assets, the liquidity of the Debtors continued to deteriorate throughout 2018.

44.     From November 2018 through spring of 2019, the Sheridan I Borrowers entered into limited waivers and proceeded with negotiations with the Lenders regarding an out-of-court restructuring transaction as discussed below. In the summer of 2019, Holdco I consummated three Oklahoma asset divestitures to bolster liquidity and extend the runway for restructuring negotiations. On July 31, 2019, Holdco I closed on the sale of leasehold acreage and vertical wellbores in Golden Trend for an aggregate purchase price of $8.4 million. On August 2, 2019, Holdco I sold wells and leasehold acreage in the Verden Northeast and Chitwood Northwest fields in Oklahoma, as well as other third-party operated properties in Oklahoma for an aggregate purchase price of $15.6 million. In the third and final sale, which closed on August 6, 2019, Holdco I sold leasehold acreage and wellbores in the Golden Trend field in Oklahoma for an aggregate purchase price of $29.4 million. Pursuant to the forbearance agreements with the Lenders, discussed below, of the $53.4 million aggregate purchase price received by Holdco I, $33.5 million is currently held in lender-controlled collateral accounts.

45.     Despite these efforts, the Sheridan I Borrowers were still burdened with a significant debt load. The Debtors' debt to EBITDA ratio is depicted below, as compared to other

small-cap E&P companies' ratios.  For the year 2019, the Debtors' total debt to EBITDA ratio was approximately 15.9x, approximately 6.4 times the median for an entity with their market capitalization.



46.     As the Debtors approached the maturity date for the Sheridan I RBL Facilities, the performance of the Debtors' assets, when combined with the recent commodity price and differential volatility, made meeting the Debtors' obligations challenging, if not impossible.

### C.     Appointment of Special Committees.

47.     The Debtors are managed and operated by Manager, which in turn acts at the direction of a six member investment committee (the "Investment Committee"), comprised of Lisa Stewart, as Executive Chairman, four independent directors, and one additional member of the Sheridan Group's management.  The Investment Committee is responsible for making investment decisions for all entities included in Sheridan I.

48.     In connection with their restructuring efforts, the Investment Committee established special committees of disinterested directors at certain of the Debtors to determine and decide potential conflicts matters between the Debtors, on the one hand, and Manager, SPC, Sheridan I's equity holders, Warburg Pincus, and other entities which make up Sheridan, on the other.  To that end, on January 29, 2019, the Debtors established a special committee at each of

SIP I, SPP I-A, SPP I-B, and SPP-M (collectively, the "Fund I Special Committees") and appointed

two disinterested directors, Anthony R. Horton and Andrew C. Kidd, to serve on the Fund I Special

Committees (collectively, the "Special Committee Members").  Katten Muchin Rosenman LLP

has been retained as independent counsel, and Conway MacKenzie, Inc. has been retained as an

independent financial advisor, with both acting at the Special Committee Members' sole direction

to assist in the discharge of their duties.

49.     The Special Committee Members and their professionals acting at their sole

direction conducted an independent investigation into interested party issues in connection with a

potential sale, restructuring, reorganization, or other recapitalization transactions and related

financings.  The Special Committee Members may also conduct inquires or investigations relating

to any conflicts matters as the Fund I Special Committees deem necessary in their business

judgment.  Specifically, the duties of the Special Committee Members include evaluating a

restructuring transaction, approving or terminating the restructuring transactions, participating in

consultation with management and advisors, and if necessary, authorizing approval of a

restructuring.

**D.     The Restructuring Negotiations.**

50.     In November 2018, the Debtors organized and commenced comprehensive

restructuring negotiations with creditors, including the agent under the Sheridan I RBL Facilities,

a steering committee of the Sheridan I RBL Lenders, and an ad hoc group of Sheridan I Term

Lenders (together, the "Lender Groups").  Substantive discussions with the lenders involved the

terms of a comprehensive restructuring transaction, as well as avoiding 2018 year-end covenant

defaults under the Sheridan I RBL Facilities and Sheridan I Term Loan Facilities.  Without the

proceeds of the SCOOP sale that were expected to pay down the outstanding debt under the

Sheridan I RBL Facilities and the Sheridan I Term Loan Facilities, discussions with the Sheridan

I RBL Lenders and the Sheridan I Term Lenders subsequently shifted to a maturity extension.  To avoid triggering an event of default, the Sheridan I Revolving Lenders and the Borrowers entered into the Limited Waiver to Second Amended and Restated Credit Agreement, dated November 27, 2018 (the "RBL Limited Waivers").  The RBL Limited Waivers provided the Debtors with runway to continue negotiating the terms of a comprehensive restructuring with the holders of their funded debt.

51.     Following 2018 year-end, the Debtors were unable to comply with the interest coverage covenant under the Sheridan I RBL Facilities and Sheridan I Term Loan Facilities.  Additionally, based on the Debtors' 2019 forecasts, Sheridan I's auditors included a going concern qualification in the Debtors' audit report.  To further facilitate a comprehensive restructuring solution, the Sheridan I RBL Lenders agreed to three extensions of the RBL Limited Waivers, on January 28, 2019, February 28, 2019, and May 3, 2019, for non-compliance with the interest coverage ratio and the going concern qualification.  Additionally, the Sheridan I Term Loan Lenders and Sheridan I Borrowers agreed to enter into the Fifth Amendment and Limited Waivers dated March 29, 2019 (the "Term Loan Limited Waivers" and, together with the RBL Limited Waivers, the "Limited Waivers").

52.     Following the Limited Waivers, the Debtors furthered discussions with the Lender Groups to reach an out-of-court restructuring solution for the Sheridan I RBL Facilities and Sheridan I Term Loan Facilities.  After weeks of extensive negotiations between the Debtors, the Lender Groups, and their respective advisors, the parties reached an agreement-in-principle for an out-of-court transaction that required, among other things, replacing the borrowing base formula with an asset coverage ratio, meeting certain asset sale milestones, and extending the maturity dates for both the Sheridan I RBL Facilities and Sheridan I Term Loan Facilities to November 1, 2021.

53.     On April 29, 2019, the Debtors posted a term sheet reflecting the proposed out-of-court transaction to solicit consent from 100% of the holders under the Sheridan I RBL Facilities and Sheridan I Term Loan Facilities.   At the time of the posting, the agreement-in-principle had the support of holders of a majority of the outstanding debt under each of the Sheridan I RBL Facilities and Sheridan I Term Loan Facilities.  In the event the Debtors were unable to obtain consent from all Sheridan I Revolving Lenders and Sheridan I Term Lenders (the "Consent Threshold") by the May 13, 2019 consent deadline (the "Consent Deadline"), the proposed amendment provided for an automatic extension of the May 6, 2019 maturity date of the Sheridan I RBL Facilities to May 31, 2019 to further solicit holdouts.

54.     The Debtors were unable to obtain consent from all secured Lenders by the Consent Deadline, triggering the automatic maturity date extension.   Accordingly, the Sheridan I Borrowers and Sheridan I Revolving Lenders agreed to enter into the Limited Forbearance Agreement dated May 17, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "RBL Forbearance Agreement"), and the Sheridan I Borrowers and Sheridan I Term Lenders agreed to enter into the Amendment to the Fifth Amendment and Limited Waivers dated May 17, 2019, under which the Lenders agreed to forbear from exercising their rights and remedies under the relevant loan documents for a limited period expiring on 11:59 p.m. (prevailing Eastern Time) on May 31, 2019.  In the interim period between May 13, 2019 and May 30, 2019, the Debtors continued to solicit the non-consenting Lenders but were unable to obtain the Consent Threshold.  On May 30, 2019, the Sheridan I Revolving Lenders and Sheridan I Term Lenders agreed to a limited extension of the Forbearance Agreement and Term Loan Limited Waiver, respectively, until June 14, 2019, to continue efforts to reach the Consent Threshold.  Ultimately, the Debtors were unable to reach a resolution with one Sheridan I Term Lender.

**E.      Restructuring Support Agreement.**

55.      Unable to refinance or amend maturities on their secured credit facilities out of court, the Debtors and the Lender Groups commenced negotiations surrounding the terms of a comprehensive restructuring transaction that would equitize the Sheridan I RBL Facilities and Sheridan I Term Loan Facilities and provide for an orderly disposition of the Sheridan I assets. Between May and September 2019, the Sheridan I Revolving Lenders and Sheridan I Term Loan Lenders agreed to extensions of the RBL Forbearance Agreements and Term Loan Limited Waivers, respectively.  Ahead of the October 1, 2019, maturity date of the Sheridan I Term Loan Facilities, the Sheridan I Term Loan Lenders and Sheridan I Borrowers also entered into a forbearance agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Term Loan Forbearance Agreement" and, collectively with the RBL Forbearance Agreement, the "Forbearance Agreements").   The Forbearance Agreements were ultimately extended, over many subsequent amendments, to February 28, 2020.

56.      In early October 2019, the Lender Groups together submitted proposals for a restructuring transaction that would equitize the Debtors' secured credit facilities and provide for a take-back exit facility.  Subsequently, the Debtors and the Lender Groups exchanged proposals with materially similar terms to those under the Plan but with differing positions on the terms of the Exit Facility and the allocation of consideration to the Debtors' existing limited partners. Following hard-fought, arms' length negotiations, the Debtors and a majority of the Lender Groups reached an agreement-in-principle on the restructuring transaction as reflected in the Plan, RSA, and the Exit Facility Term Sheet attached as Exhibit A to the Plan.  As set forth in the RSA, the Secured Lenders and Debtors agreed to extend the forbearance period under the Forbearance Agreements to the Petition Date upon execution of the RSA.

57.     Specifically, the Plan contemplates equitization of Sheridan I's secured debt, a take-back exit facility, and a conditional distribution of new warrants to limited partners.  The new warrants serve as settlement consideration for limited partners' release of the Released Parties as set forth in the Plan.  As set forth in the New Warrant Term Sheet, the new warrants will be exercisable into 20% of the New Sheridan Equity, on a fully diluted basis, issued by New Sheridan at a threshold equal to the outstanding Sheridan I RBL Loans and Sheridan I Term Loans (including DPOs) immediately prior to the Petition Date, less the amount of the new loans under the Exit Facility and excess balance sheet cash, if any, distributed to the holders of the New Sheridan Equity.  The threshold will increase at 12% per annum except to the extent a cash dividend is paid on the new equity in any year prior to the exercise of the new warrants.

58.     With the RSA in hand, the Debtors completed solicitation of the prepackaged Plan prior to the Petition Date.  The RSA contemplates, and the Plan reflects, the following stakeholder recoveries:

- Holders of Administrative Claims and Other Priority Claims will receive payment in full in cash;

- The Lenders will receive (i) their ratable share of the Exit Facility, (ii) 100% of the New Sheridan Equity (subject to dilution from the New Warrants), and (iii) the Excess Balance Sheet Cash, if any;

- General Unsecured Claims will be Reinstated or otherwise receive payment in full in cash; and

- The Limited Partners shall receive, in exchange for the releases provided by such holders of the Released Parties, their ratable share of the New Warrants.

59.     Preserving value for the benefit of the Debtors' estates depends, in large part, on the Debtors proceeding swiftly to confirmation of the Plan and emergence from chapter 11 to provide for an orderly transition to new management.  Accordingly, the Debtors commenced these chapter 11 cases to implement the balance sheet restructuring contemplated under the RSA to

provide runway for the orderly disposition of Sheridan I's assets rather than a value-destructive fire sale of all assets.

60.     As described in the Scheduling Motion (as defined in Exhibit A attached hereto), the Debtors request that the Bankruptcy Court schedule the hearing to approve the adequacy of the Disclosure Statement and confirm the Plan for March 24, 2020, at 2:30 p.m., prevailing Central Time.   The Debtors respectfully submit that the proposed confirmation schedule is appropriate—and, indeed, necessary—in light of the unique circumstances of these chapter 11 cases, where nearly all funded debt holders have already agreed to support the Plan and the allowed claims of all other creditors will ride through the bankruptcy unimpaired.   In light of the unprecedented consensus forged to date, it would be detrimental for all parties in interest if any delays prevented the Debtors from expeditiously consummating the Plan.

**VII.    First Day Motions.**

61.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.   I have reviewed each of the First Day Motions.   I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.   A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  March 23, 2020                     */s/ Lisa A. Stewart*
                                           Lisa A. Stewart
                                           Executive Chairman and Chief Investment Officer

## Exhibit A

**Evidentiary Support for First Day Motions**

<u>**Administrative and Procedural Motions**</u>[1]

I.      **Debtors' <u>Emergency</u> Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases ("<u>Joint Administration Motion</u>").**

1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each of the Debtor entities.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the Office of the United States Trustee for the Southern District of Texas and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

2.      I believe that the relief requested in the Joint Administration Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  If the relief requested in the Joint Administration Motion is not granted, the Debtors' smooth transition into chapter 11 could be jeopardized by increasing the fees and costs associated with duplicative filings and objections.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be approved by the Court.

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motion.

II.     **Debtors' <u>Emergency</u> Application for Entry of an Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent ("<u>Claims and Noticing Agent Application</u>").**

3.      Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Prime Clerk LLC as the Claims and Noticing Agent for the Debtors in their chapter 11 cases to: (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and other parties in interest; (b) provide computerized claims, objection, solicitation, and balloting-related services; and (c) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these chapter 11 cases.

4.      I believe that the appointment of Prime Clerk will provide the most effective and efficient means of ensuring creditors receive sufficient notice and have their claims adjudicated properly.  Further, Prime Clerk will relieve the Debtors and/or the Clerk's Office of the administrative burden of noticing, administering claims, and soliciting and tabulating votes.  The relief requested in the Claims and Noticing Agent Application is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  If the relief requested in the Claims and Noticing Agent Application is not granted, I believe that the Debtors' may be unable to ensure that their creditors receive sufficient notice and have their claims adjudicated properly. The appointment of Prime Clerk is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Claims and Noticing Agent Application should be approved by the Court.

III.    **Debtors' <u>Emergency</u> Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 50 Largest Unsecured Creditors ("<u>Creditor Matrix Motion</u>").**

5.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated creditor matrix and list of the 50 largest general

unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor.

6.      I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.  The relief requested in the Creditor Matrix Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  If the relief requested in the Creditor Matrix Motion is not granted, the Debtors would face an undue administrative burden at this critical juncture.  The preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be approved by the Court.

**IV.     Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Notice, and (V) Waiving the Requirements that the U.S. Trustee Convene a Meeting of Creditors and the Debtors File Schedules and SOFAs ("<u>Scheduling Motion</u>").**

7.      Pursuant to the Scheduling Motion, the Debtors request entry of an order: (a) scheduling a Combined Hearing on confirmation of the Debtors' Plan and the adequacy of the Debtors' Disclosure Statement; (b) establishing the Objection Deadline for filing objections to the adequacy of the Disclosure Statement and confirmation of the Plan and approving related procedures; (c) establishing a Reply Deadline for any objections; (d) approving the Solicitation Procedures regarding votes to accept or reject the Plan; (e) approving the form and manner of notice of commencement of these chapter 11 cases and the Confirmation Hearing and the form and manner of the notice of the Publication Notice; (f) conditionally directing that the U.S. Trustee not convene the Creditors Meeting under section 341 of the Bankruptcy Code, provided that the

Plan is confirmed within seventy-five (75) days of the Petition Date; (g) waiving the requirement that the Debtors file statements of financial affairs and schedules of assets and liabilities, provided that the Plan is confirmed within seventy-five (75) days of the Petition Date; and (h) allowing the notice period for the Disclosure Statement and Confirmation Hearing to run simultaneously.

8.    In connection with the relief requested in the Scheduling Motion, the Debtors request that the Court approve the following Confirmation Schedule:

| Event | Date |
| --- | --- |
| Voting Record Date | February 12, 2020 |
| Solicitation Launch | February 21, 2020 |
| Mailing Date | February 21, 2020 |
| Voting Deadline | March 6, 2020, at 4:00 p.m., prevailing Central Time |
| Opt-Out Deadline | March 20, 2020, at 4:00 p.m., prevailing Central Time |
| Objection Deadline | March 20, 2020, at 4:00 p.m., prevailing Central Time |
| Petition Date | March 23, 2020 |
| Reply Deadline | March 24, 2020 |
| Confirmation Hearing | March 24, 2020, at 2:30 p.m., prevailing Central Time |

9.    As set forth in the Scheduling Motion, the Debtors have provided full notice of the Plan to all known parties in interest, consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules. On February 21, 2020, the Debtors distributed the Confirmation Notice, setting forth the Debtors' intention to proceed with confirmation at the first day hearing, to approximately 21,000 creditors and interested parties. The Confirmation Notice provided notice of the Objection Deadline (set 28 days after mailing) and provided detailed instructions as to how parties could object to the Plan or Disclosure Statement. The Plan and Disclosure Statement were simultaneously posted to the voting creditors and on the Claim and Noticing Agent's public website. The Debtors published the Confirmation Notice in the *New York Times* (national edition) on February 24, 2020 and the *Houston Chronicle* on February 25, 2020. In addition, the Debtors

posted the Plan Supplement to the public website on March 13, 2020 and served a notice of Plan Supplement to each party served with the Combined Notice.   The Debtors also served a notice on the entire creditor matrix directing interested parties to review the "first day" pleadings posted to the public website on March 17, 2020.  Finally, on March 20, 2020, the Debtors served a notice on the entire creditor matrix directing interested parties to review the confirmation pleadings posted to the public website on March 20, 2020.  All parties in interest have been provided a full and fair opportunity to participate in these chapter 11 cases.

10.      I believe that the relief requested in the Scheduling Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  If the relief requested in the Scheduling Motion is not granted, the Debtors' ability to transition their assets to new management would be severely disrupted.  I further believe that the relief requested in the Scheduling Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to minimize any potential adverse effects to the Debtors' businesses as a result of the restructuring, and position the Debtors for a prompt emergence from bankruptcy and smooth transition to new management.   Specifically, the Confirmation Schedule reflects milestones that were heavily negotiated as part of the RSA and a key inducement factor for creditors' support of these chapter 11 cases.  Given the robust noticing procedures described in the Scheduling Motion, I believe that the proposed Confirmation Schedule provides ample time for any interested party to participate in these chapter 11 cases and will preserve significant value for the Debtors' estates and their stakeholders, as more fully set forth in the Scheduling Motion. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Scheduling Motion.

**Operational Motions**

V.   **Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue to Operate their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Perform Intercompany Transactions ("<u>Cash Management Motion</u>").**

11.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors (directly or through SPC) to (a) continue to operate their Cash Management System, (b) honor certain prepetition obligations related thereto, (c) maintain existing Business Forms in the ordinary course of business, and (d) continue to perform the Intercompany Transactions consistent with historical practice.

12.     In the ordinary course of business, the Debtors and certain of their non-Debtor affiliates operate a complex cash management system (the "<u>Cash Management System</u>").  The Debtors use the Cash Management System to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Cash Management System is specifically tailored to meet the operating needs of the Debtors and their non-Debtor affiliates by enabling participants to effectively and centrally control and monitor corporate funds, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances and related information.  The Debtors maintain daily oversight of the Cash Management System to implement cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions.  Additionally, the Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transactions are accounted for properly.

   A.     **Cash Collection and Distribution.**

13.     Non-Debtor affiliate, SPC, maintains three Depository Accounts at Wells Fargo and one depository account at Chase, and Debtor Sheridan Holding Company I, LLC, maintains

the Holdco I Depository Account at Wells Fargo.  The HoldCo I Depository Account and the three Depository Accounts collect revenue generated by the Debtors' and their non-Debtor affiliates' operating activities, including oil and gas sales, royalty receipts, and joint interest billing reimbursements.  Incoming funds generated by the Debtors' oil and gas sales and royalty receipts are deposited directly into one of three Depository Accounts.  In contrast, the Debtors' joint interest billing reimbursements are deposited into either the JIB Depository Account or the JPMC Receipts Depository Account, depending on the identity of the payor.

14.     As promptly as practicable, funds contained in the Holdco I Depository Account, the JIB Depository Account, the JPMC Receipts Depository Account, and the Revenue Receipts Depository Account are transferred to the Concentration Account.  In addition, certain other funds, such as desktop deposits and checks delivered directly to the Debtors' headquarters are deposited directly into the Concentration Account.  The Concentration Account serves as the Debtors' centralized main operating account to which receipts are deposited and from which disbursements are made throughout the Cash Management System as necessary.  To the extent that funds contained in the Concentration Account exceed $10 million, those excess funds are transferred to the Holdco I Depository Account.  The Concentration Account is funded by the aforementioned revenue and joint interest billing reimbursement receipts generated by the Debtors' operating activities, while the Master Operating Account is funded from the Concentration Account and other concentration accounts held by non-Debtor affiliates.

15.     SPC periodically transfers funds from the Concentration Account to the Master Operating Account to fund the Debtors' indirect expenses including payroll, regulatory and accounts payable wires, fleet card expenses, and transportation and entertainment card expenses. SPC periodically reviews funding and reimbursements to ensure the Debtors and their non-Debtor

affiliates have adequately funded the Master Operating Account.  To the extent that the Debtors do not transfer sufficient funds to cover their allocable portion of indirect expenses being paid from the Master Operating Account, the Debtors advance payments to, or reimburse, SPC by transferring funds from the Concentration Account to the Master Operating Account as needed.

16.     In addition to the Master Operating Account, to manage daily cash inflows and outflows associated with the Debtors' and their non-Debtor affiliates' operations, SPC maintains three other Disbursement Accounts at Wells Fargo that are funded by the Concentration Account and other concentration accounts utilized solely by non-Debtor affiliates  The Disbursement Accounts are used to make payments associated with the Debtors' and their non-Debtor affiliates' operating activities, including check issuances and ACH transfers.

**B.     Intercompany Transactions.**

17.     In the ordinary course operation of the Cash Management System, the Debtors maintain an intercompany accounting module within the Debtors' integrated accounting system that provides a method for tracking and allocating receivables and payables of the Debtors and their non-Debtor affiliates.  The Debtors have historically, in the ordinary course of business, engaged in routine Intercompany Transactions with each other and certain of their non-Debtor affiliates, resulting in Intercompany Claims.  The Intercompany Transactions have historically included payments and expense reimbursements related to general and administrative expenses, employee compensation, hedge payments, debt payments, and fund transfers related to the acquisition or divestiture of assets.

18.     SPC, pursuant to the Amended and Restated Sheridan Omnibus Cash Management and Agency Agreement acts as payment agent and makes cash transactions on behalf of the Debtors from the Concentration Account and the SPC Accounts.  SPC also performs all services

with respect to the operation of the Debtors' properties, including but not limited to, drilling, testing, completion and operation of the Debtors' wells, and procurement of drilling rigs, equipment, supplies, and other services as may be necessary for the operation and supervision of the contractors and vendors providing such equipment and services.  SPC is the counterparty to office leases, contracts, licenses, surface use agreements and easements for the benefit of the Debtors.  The Debtors also reimburse Manager for certain general and administrative expenses paid by Manager on behalf of the Debtors in connection with Manager's administration of the Debtors' assets.

19.    As a result of the foregoing, Intercompany Transactions between the Debtors and SPC, and the Debtors and Manager, are an essential component of the Debtors' complex operations.  More specifically, the Debtors engage in Intercompany Transactions to, among other things, complete transactions with administrative ease, facilitate operations on a daily basis, fund necessary capital expenditures, and advance payments to, or reimburse Manager and SPC for, certain general and administrative expenses accrued by Manager and SPC in connection with the management of the Debtors' assets.   At any given time, as a result of the Intercompany Transactions, there may be claims owing by one Debtor to another Debtor or between a Debtor and non-Debtor affiliate.  The Debtors closely track all fund transfers in their respective accounting systems and, therefore, can ascertain, trace, and account for all Intercompany Transactions.

20.    The Intercompany Transactions are trackable, and the Debtors intend to account for all postpetition Intercompany Transactions in accordance with pre-bankruptcy practice and procedures.  Any interruption of the Intercompany Transactions—including failure to advance payments to, or reimburse non-Debtor affiliates Manager and SPC for, Intercompany Claims related to the Debtors—would severely disrupt the Debtors' operations and result in great harm to

the Debtors' estates and their stakeholders.  In particular, Manager and SPC have no other source of funds to operate the Debtors' business or make payments on the Debtors behalf.  Failure to advance payments to, or reimburse Manager and SPC for, Intercompany Claims payable to them would result in such entities lacking sufficient funds to pay employees and vendors and otherwise operate the Debtors' business on a go-forward basis.

### C.    Bank Accounts.

21.    As of the Petition Date, the Cash Management System includes a total of 14 Bank Accounts.  The Bank Accounts can be separated into four categories:  (a) five Debtor Accounts; (b) six SPC Accounts; (c) two SPC Fund I Accounts; and (d) one Manager Account.  Each of the Bank Accounts, other than one of the SPC Fund I Accounts and the Manager Account, resides at Wells Fargo Bank, N.A.  One of the SPC Fund I Accounts resides at JPMorgan Chase and the Manager Account resides at Bank of America, N.A.

22.    In 2019, the Debtors and their non-Debtor affiliates paid approximately $41,500 in Bank Fees to the Cash Management Banks to maintain the aforementioned Bank Accounts, which are generally debited directly from the Bank Accounts on a monthly basis.  The Debtors and their non-Debtor affiliates paid Bank Fees in the following approximated amounts:  $31,000 to Wells Fargo in 2019 and $5,200 so far in 2020; $4,500 to Bank of America in 2019 and $750 so far in 2020; and $6,000 to Chase in 2019 and $1,000 so far in 2020.  The Debtors estimate that they do not owe the Cash Management Banks any Bank Fees as of the Petition Date.

### D.    Credit Card Programs.

23.    As part of the Cash Management System, SPC provides certain employees with Credit Cards, such as fleet and fuel cards, office expense cards, and travel and entertainment cards. The fleet and fuel cards are issued by Shell, the office expense cards are issued by CSI, and the

travel and entertainment cards are issued by American Express.  The employees use the Credit Cards for approved, legitimate and documented business expenses and supplies incurred on behalf of the Debtors in the ordinary course of business.  CSI, Shell and American Express debit funds from the Master Operating Account on a monthly basis for costs incurred through use of the Credit Cards.  In addition, the Debtors and their non-Debtor affiliates pay service fees of approximately $2,000 annually in the aggregate for the use of the Credit Cards issued under the Credit Card Program.

24.     I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business.  Requiring the Debtors to implement changes to the Cash Management System during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  The Cash Management System also provides the Debtors with the ability to quickly create status reports on the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds.

25.     I believe any disruption of the Cash Management System could cause immediate and irreparable harm to the Debtors' restructuring efforts.  Indeed, requiring the Debtors to adopt a new cash management system could adversely affect the Debtors' ability to maximize value. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be approved by the Court.

**VI.     Debtors' <u>Emergency</u> Motion Seeking Entry of an Order Authorizing, but not directing, the Debtors to Continue their Prepetition Business Operations, Policies, and Practices and Pay Related Claims in the Ordinary Course of Business on a Postpetition Basis ("<u>Ordinary Course Payments Motion</u>").**

26.     Pursuant to the Ordinary Course Payments Motion, the Debtors request (a) authorization for the Debtors to continue their prepetition business operations, policies, and programs and to pay (directly or through SPC) Ordinary Course Claims, on a postpetition basis in the ordinary course of business and (b) authorization of other related relief.

27.     Here, the Plan—which has garnered unanimous support from creditors entitled to vote on the Plan—proposes to pay all non-debt claims in full in the ordinary course of business. Moreover, pursuant to the RSA, the Debtors' secured lenders have agreed to permit the Debtors to continue to access cash collateral during the pendency of these chapter 11 cases, thereby providing the Debtors with the funding necessary to satisfy the Ordinary Course Claims in the ordinary course of business.

28.     Accordingly, I believe that authorizing the Debtors to pay undisputed prepetition Ordinary Course Claims of the Ordinary Course Creditors as such claims become due and payable in the ordinary course of business will minimize any disruption to the Debtors' business, allow for a smooth and expeditious reorganization in these chapter 11 cases, and lay the groundwork for an essential element of the Plan, which leaves such claims unimpaired.

29.     As described in the Ordinary Course Payments Motion, I believe that payment of the Ordinary Course Claims is necessary to avoid the immediate and irreparable harm that would result from either (i) the Ordinary Course Creditors taking adverse action that prevents the Debtors from operating in the normal course or (ii) by not providing Employees with compensation and benefits.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should approve the Ordinary Course Payments Motion.

**A.      Trade Claims.**

30.      The Debtors incur a variety of trade obligations in the ordinary course of business, including expenses related to taxes and fees, utility services, lease operating, capital expenditures, and G&A to certain Trade Creditors to ensure the continued operation of the Debtors' oil and gas leases.  The majority of the Trade Claims are paid by SPC on behalf of the Debtors.

31.      I understand that certain general unsecured creditors and creditors whose Trade Claims may give rise to liens under certain state and federal laws provide the Debtors, or SPC on behalf of the Debtors, with goods and services in the ordinary course of business, including, among other things, materials, equipment, or supplies used in the drilling, operating, or maintenance of oil and gas property and other basic business necessities for the operation of the Debtors' businesses.  I further believe that failing to pay certain Trade Claims on account of taxes and fees could materially disrupt the Debtors' business operations.  The taxing authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process.  Further, unpaid taxes and fees may result in penalties, the accrual of interest, or both, which could negatively affect the Debtors' business.

32.      The following table contains descriptions of the allowed prepetition Trade Claims, and the Debtors' estimate of the net amounts of the Trade Claims accrued as of the Petition Date to be approximately $14,450,000, in the aggregate.

| Category | Description of Trade Claims | Estimated Amount Outstanding as of the Petition Date |
|---|---|---|
| Lease Operating Expenses | Lease operating expenses on account of working interests in the oil and gas leases and on behalf of the non-operating working interest owners | $6,000,000 |

| Category | Description of Trade Claims | Estimated Amount Outstanding as of the Petition Date |
|---|---|---|
| Taxes and Fees | Sales and use taxes, property taxes, annual reporting and other fees, franchise taxes and fees, commercial activity taxes, customs and import duties, state and local taxes, and other taxes. | $3,750,000 |
| Utility Services | Claims related to water, sewer, waste disposal, electricity, internet, natural gas, and other similar services from a number of utility providers to support the Debtors' businesses. | $3,000,000 |
| Capital Expenditures | Claims related to capital improvements, and facilities maintenance. | $900,000 |
| G&A Expenses | Claims related to litigation accrual, legal firms and services, general operations and human resources services, accounting, audit, tax, and other financial services. | $800,000 |
| | **Total estimated amount** | **$14,450,000** |

B.      **Mineral Claims.**

33.      The Debtors also incur Royalty Interest obligations in the ordinary course of business, including expenses related to working interests, overriding royalty interests, non-participating royalty interests, net profits interests, production payments, and unleased mineral interests.  In addition, the Debtors incur obligations related to Non-Op Working Interests where the Debtors market and sell minerals on behalf of the Non-Op Working Interest holders. The Mineral Claims are owed to certain of the Mineral Creditors to ensure the continued operation of the Debtors' Oil and Gas Leases.

34.      I understand that the failure to pay Mineral Claims under various Oil and Gas Leases, intercompany net profits agreements, or state statutory frameworks could expose the Debtors to such enforcement actions and could result in actions seeking the forfeiture, cancellation, or termination of Oil and Gas Leases.  The following table summarizes the Mineral Claims that Debtors estimate are accrued but unpaid as of the Petition Date.

14

| Category | Description of Mineral Claims | Estimated Amount Outstanding as of the Petition Date |
|---|---|---|
| Mineral Payments | Claims related to royalty interests and other interest burdens. | $10,500,000 |
| Working Interest Disbursements | Claims related to working interest disbursements. | $3,500,00 |
| | **Total estimated amount** | **$14,000,000** |

### C.      Employee Compensation and Benefit Claims.

35.      As of the Petition Date, the Non-Debtor affiliate, SPC, employs approximately 416 Employees on account of the Debtors and affiliated non-Debtor entities.  Approximately 227 of these Employees are employed on account of the Debtors and perform a wide variety of functions critical to the Debtors' day-to-day operations.  All of the Employees are full time.  Approximately 84 Employees are paid on an hourly basis, and approximately 143 Employees earn a salary. Approximately 130 of these Employees divide their time between two or more of the separate investment funds managed by SPC.  The Employees are not represented by a collective bargaining unit.  In addition to the Employees, SPC also periodically retains specialized individuals as Independent Contractors to complete discrete projects on behalf of the Debtors.  At this time, SPC retains approximately five Independent Contractors on behalf of the Debtors and these Independent Contractors are an important and cost-effective supplement to the efforts of the Employees.

36.      The Employees and Independent Contractors perform a wide variety of functions critical to the Debtors' operations.  In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. Without the continued, uninterrupted services of their Employees and Independent Contractors, the Debtors' reorganization efforts will be threatened.

37.     I believe a significant portion of the value of the Debtors' businesses is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I therefore believe payment of the prepetition obligations with respect to the Employee Compensation and Benefits Claims is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases and through a transition to new management.

38.     The following table summarizes the Employee Compensation and Benefit Claims that the Debtors estimate are accrued but unpaid as of the Petition Date.

| Category | Description of Employee Compensation and Benefit Claims | Estimated Amount Outstanding as of the Petition Date |
|---|---|---|
| Employee Compensation and Unpaid Wages | Ordinary Course Claims with respect to Employees' salaries, wages, and overtime compensation. | $300,000 |
| Independent Contractor Compensation | Ordinary Course Claims with respect to amounts payable to Independent Contractors for critical services rendered including administrative functions, like information technology and maintenance services and operational functions related to the Debtors' oil and gas businesses. | $50,000 |
| Unpaid Employee Withholding Obligations | Ordinary Course Claims with respect to amounts withheld from Employee compensation and unpaid wages related to, among other things, various income taxes, health and welfare programs, garnishments, various governmental social programs, health insurance premiums and retirement savings contribution. | $75,000 |
| Unpaid Employer Obligations | Ordinary Course Claims with respect to amounts due under applicable law requiring the Debtors to remit certain funds to the appropriate taxing authority on account of various taxes and fees for, among other things, unemployment insurance, Social Security and Medicare taxes, and health and insurance programs. | $20,000 |
| Payroll Processing Fees | Ordinary Course Claims with respect to third-party payroll processing services. | $7,000 |
| Reimbursable Expenses | Ordinary Course Claims with respect to costs incurred related to (a) mileage associated with an Employee travel's for reasonable business related purposes and (b) miscellaneous expenses that arise in the ordinary course of business. | $10,000 |

| Category | Description of Employee Compensation and Benefit Claims | Estimated Amount Outstanding as of the Petition Date |
|---|---|---|
| Employee Benefits Programs | Ordinary Course Claims with respect to contributions to various health benefits plans, life and accidental death and dismemberment insurance, auxiliary benefits, disability benefits, workers' compensation program, Employees' 401(k) plans, and paid time off and paid leave. | $150,000 |
| Non-Insider Severance Programs | Ordinary Course Claims with respect to severance payments owed to eligible Employees. | $0[3] |
| | **Total estimated amount** | **$612,000** |

**VII.    Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Prepetition Secured Parties, (C) Scheduling a Final Hearing, (D) Modifying the Automatic Stay, and (E) Granting Related Relief ("<u>Cash Collateral Motion</u>").**

39.    Pursuant to the Cash Collateral Motion, the Debtors seek entry of an Interim Order and Final Order (a) authorizing the Debtors to use the Cash Collateral of the Prepetition Secured Parties, (b) granting adequate protection to the Prepetition Secured Parties, (c) scheduling a Final Hearing, if necessary, no later than on the earlier of (i) the date of any hearing to confirm the Plan and (ii) 30 days after the Petition Date, (d) modifying the automatic stay, and (e) granting related relief.

40.    I believe that the Debtors' access to cash collateral is critical for achieving their goal of confirming the Plan at the first day hearing.  The Debtors do not seek access to debtor-in-possession financing and nearly all of the Debtors' oil and gas properties and related assets constitute Prepetition Collateral on which the Prepetition Secured Parties have liens.  The Debtors' business model is predicated upon their ability to build the value of their oil and gas

---

[3]    As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid obligations under the Non-Insider Severance Programs.  As discussed in the First Day Declaration, it is anticipated that SPC will make significant workforce reductions on or around March 31, 2020.  Accordingly, by this Motion, the Debtors are seeking authority to reimburse SPC for approximately $2,750,000 on account of non-insider severance allocable to the Debtors solely to the extent the Debtors' chapter 11 plan is not confirmed prior to the anticipated workforce reduction.

assets through capital reinvestment, operational improvements, and enhanced recovery. Thus, the orderly continuation of the Debtors' operations and the preservation of their going concern value is largely dependent upon their ability to regularly convert the Prepetition Collateral into Cash Collateral and use it in their operations.

41.     I further understand that the Debtors, with the assistance of their advisors, have developed a 13-week cash flow forecast and Budget for the use of Cash Collateral during the interim period. I believe that the Budget establishes that the Debtors will have adequate liquidity during the interim period. The Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Budget is prepared. I understand that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Budget.

42.     With their chapter 11 goals in mind, and recognizing that substantially all of their cash and other assets were pledged as Prepetition Collateral to secure their Prepetition Obligations, the Debtors engaged in discussions with advisors to the Term Loan Secured Parties and RBL Secured Parties before the Petition Date. Following extensive arm's-length negotiations, the Debtors and the Prepetition Secured Parties came to an agreement regarding the consensual use of Cash Collateral, which is embodied in the Interim Order. The provisions of the Interim Order were extensively negotiated and are the most favorable terms that the Debtors were able to obtain under the circumstances. Approval of the Cash Collateral Motion will ensure that the Debtors are able to maintain their operations, pursue and achieve the restructuring transactions embodied in the RSA and Plan, and maximize the value of their estates for the benefit of all stakeholders.

43.     I believe that without the immediate relief requested by the Cash Collateral Motion, the Debtors face a material risk of immediate and irreparable harm. Indeed, any delay in the

authorization to use Cash Collateral would hinder the Debtors' operations and jeopardize the viability of an orderly transition to new management.  I further believe that access to Cash Collateral will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and responsibly administer these chapter 11 cases throughout the period that the Debtors expect will be necessary to implement and effectuate their restructuring as provided for in the RSA and the Plan.

44.    Accordingly, I believe that the Debtors' consensual use of Cash Collateral and agreed-upon adequate protection package is fair and appropriate under the circumstances of these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

*[Remainder of page intentionally left blank]*

**<u>Exhibit B</u>**

**Corporate Organizational Structure**



**SHERIDAN**

| Fund I | | | | |
|---|---|---|---|---|
| Total Debt: $616,072,418 | | | | |
| | Revolver (Secured) | | Term Loan (Secured) | |
| | Outstanding Principal | Maturity | Outstanding Principal | Maturity |
| SIP I | $137,697,252 | 5/6/2019 | $370,008,028 | 10/1/2019 |
| I-A | $18,246,014 | 5/6/2019 | $49,029,094 | 10/1/2019 |
| I-M | $11,144,772 | 5/6/2019 | $29,947,259 | 10/1/2019 |
| | Total Outstanding: $167,088,037 | | Total Outstanding: $448,984,381 | |

Sheridan ICM, LLC (DE)

Sheridan SMG, LLC [1] (DE)

Sheridan SMG I Carry, LLC (DE)

Sheridan Production Partners Manager LLC (DE)

Sheridan Production Company, LLC (DE)

WPS Production Partners, LLC

Sheridan Production Company I, LLC (DE)

Sheridan Production Company II, LLC (DE)

**Key**

Debtor

Non-Debtor

Sheridan Investment Partners I, LLC (DE)

Sheridan Production Partners I, LLC (DE)

GP of I-A & I-M

Sheridan Production Company III, LLC (DE)

GP of I-A & I-M

SPP I-B GP, LLC (DE)

Sheridan Production Operating Company, LLC (DE)

Preferred Equity

GP of I-B

Sheridan Production Partners I-A, L.P. (DE)

Sheridan Production Partners I-B, L.P. (DE)

NPI Royalties 92.512%

Sheridan Production Partners I-M, L.P. (DE)

Sheridan Holding Company I, LLC (DE)

**Fund I**

**Notes**
1. Sheridan SMG, LLC ownership with respect to Series I

## Exhibit C

**Restructuring Support Agreement**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached to this agreement in accordance with Section 14.02, this "**Agreement**") is made and entered into as of February 27, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (vi) of this preamble, collectively, the "**Parties**"):[1]

i. Sheridan Production Partners I-A, L.P. ("**SPP I-A**"), a limited partnership organized under the Laws of Delaware, Sheridan Investment Partners I, LLC ("**SIP I**"), a limited liability company organized under the Laws of Delaware, Sheridan Production Partners I-B, L.P. ("**SPP I-B**"), a limited partnership organized under the Laws of Delaware, Sheridan Production Partners I-M, L.P. ("**SPP I-M**"), a limited partnership organized under the Laws of Delaware, Sheridan Holding Company I, LLC, a limited liability company organized under the Laws of Delaware ("**HoldCo**"), and each of the other Entities identified as Company Parties on their signature pages that have executed and delivered counterpart signature pages to this Agreement to counsel to the Term Loan Group and counsel to the RBL Agent (the Entities in this clause (i), collectively, the "**Company Parties**");

ii. Sheridan Production Partners Manager, LLC, a Delaware limited liability company ("**Manager**");

iii. Sheridan ICM, LLC, a Delaware limited liability company ("**ICM**"), Sheridan SMG, LLC, a Delaware limited liability company ("**SMG**"), Sheridan SMG I Carry LLC, a Delaware limited liability company ("**SMG I Carry**"), Sheridan Production Company I, LLC, a Delaware limited liability company, Sheridan Production Company, LLC, a Delaware limited liability company (collectively, "**SPC**"), and WPS Production Partners, LLC ("**WPS**" and, the Entities in this clause (iii), collectively, the "**Manager Affiliates**");

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

iv.      Warburg Pincus, LLC ("**Warburg**");

v.      the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Sheridan I RBL Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (v), collectively, the "**Consenting Sheridan I RBL Lenders**"); and

vi.      the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Sheridan I Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (vi), collectively, the "**Consenting Sheridan I Term Lenders**" and, together with the other entities in clauses (v) and (vi), the "**Consenting Lenders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the following documents (the "**Restructuring Transactions**"):

- the proposed chapter 11 plan of reorganization, substantially in the form attached as **Exhibit A** to this Agreement (the "**Plan**");

- the term sheet setting forth the terms and conditions of the exit financing facility, attached as **Exhibit A** to the Plan (the "**Exit Facility Term Sheet**"); and

- the term sheet setting forth the terms and conditions of the New Warrants, attached as **Exhibit B** to the Plan (the "**New Warrant Term Sheet**").

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Chapter 11 Cases**") and consummating the Plan; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>Affiliate</u>**" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"**<u>Agents</u>**" means any administrative agent, collateral agent, or similar Entity under any of the Sheridan I RBL Credit Agreements or Sheridan I Term Loan Credit Agreements, including any predecessors or successors thereto.

"**<u>Agreement</u>**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached to this Agreement in accordance with Section 14.02.

"**<u>Agreement Effective Date</u>**" means the date on which the conditions set forth in Section 2 have been satisfied or waived in accordance with this Agreement.

"**<u>Agreement Effective Period</u>**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**<u>Alternative Restructuring Proposal</u>**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that in each case is an alternative to one or more of the Restructuring Transactions.

"**<u>Avoidance Actions</u>**" means any and all actual or potential avoidance, recovery, subordination, or other Claims, causes of action, or remedies that may be brought by or on behalf of the Company Parties, their estates, or other parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, causes of action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**<u>Bankruptcy Code</u>**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**<u>Bankruptcy Court</u>**" means the United States Bankruptcy Court presiding over the Chapter 11 Cases, which shall be the United States Bankruptcy Court for the Southern District of Texas.

"**<u>Business Day</u>**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**<u>Cause of Action</u>**" means any Claim, cause of action, Avoidance Action (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Company Parties), controversy, demand, right, action, indemnity, suit, obligation, liability, damage, judgment, account, defense, offset, power, and privilege of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**<u>Chapter 11 Cases</u>**" has the meaning set forth in the recitals to this Agreement.

"**<u>Chosen Court</u>**" means, (a) before one or more Company Parties commences Chapter 11 Cases, federal courts or state courts located in the City of New York, New York and, (b) after commencement of such proceeding, in the Bankruptcy Court with jurisdiction over such proceeding.

"**<u>Claim</u>**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**<u>Collateral Agent</u>**" means Bank of America, N.A., solely in its capacities as Collateral Agent under the Sheridan I RBL Credit Agreements and the Sheridan I Term Loan Credit Agreements.

"**<u>Company Claims/Interests</u>**" means any Claim against, or Equity Interest in, a Company Party, including Sheridan I RBL Claims and Sheridan I Term Loan Claims.

"**<u>Company Parties</u>**" has the meaning set forth in the preamble to this Agreement.

"**<u>Company Releasing Party</u>**" means each of the Company Parties and, to the maximum extent permitted by Law, each of the Company Parties, on behalf of their respective Affiliates and Related Parties.

"**<u>Confidentiality Agreement</u>**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**<u>Confirmation Order</u>**" means the confirmation order with respect to the Plan.

"**Consenting Lender Fees and Expenses**" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transaction and not previously paid by, or on behalf of, the Company Parties of: (i) (a) Davis Polk & Wardwell LLP, as counsel to the Term Loan Group, (b) any local counsel to the Term Loan Group and (c) Houlihan Lokey Capital, Inc., as financial advisor to Davis Polk & Wardwell LLP in connection with its representation of the Term Loan Group; (ii) (a) Vinson & Elkins LLP, as counsel to the RBL Agent and Collateral Agent, (b) any local counsel to the RBL Agent, and (c) FTI Consulting, Inc., as financial advisor to Vinson & Elkins LLP in connection with its representation of the RBL Agent; and (iii) any consultants or other professionals retained by Davis Polk & Wardwell LLP, Vinson & Elkins LLP, the Term Loan Group or Agents in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), in each case, in accordance with the engagement letters of such consultant or professional signed by the Company Parties, including, without limitation, any success, back end, or restructuring fees contemplated therein (which such fees are deemed reasonable hereunder), and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals.

"**Consenting Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sheridan I RBL Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sheridan I Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholder Releasing Party**" means, each of, and in each case in its capacity as such:  (a) each Consenting Stakeholder; (b) each Agent; (c) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (d).

"**Consenting Stakeholders**" means each of the Consenting Lenders and each of the Manager Parties.

"**Debtor**" means each of the Company Parties in its capacity as a debtor in its respective Chapter 11 Case.

"**Definitive Documents**" means all of the definitive documents implementing the Restructuring Transactions, including those set forth in Section 3.

"**Description of Transaction Steps**" shall have the meaning set forth in the Plan.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Enforcement Action**" means any action of any kind, except as necessary to file and defend any Company Claims/Interests in conjunction with the Chapter 11 Cases, to (a) exercise or enforce any right under any guarantee or any right in respect of any "Lien" as defined in the Sheridan I RBL Credit Agreements and Sheridan I Term Loan Credit Agreements (including, for the avoidance of doubt, any security interest granted under any of the Sheridan I RBL Credit Agreements and the Sheridan I Term Loan Credit Agreements), in each case granted in relation to (or given in support of) all or any part of any Company Claims/Interests or (b) sue, claim or institute or continue legal proceedings against any Company Party or any Manager Party.

"**Entity**" means any person, individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, governmental body or any agency or political subdivision of any governmental body, or any other entity, whether acting in an individual, fiduciary, or other capacity.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, general or limited partnership interests, limited liability company interests, and any other equity, ownership, or profits interests, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into or based on the value of such shares (or any class thereof) of, common stock, preferred stock, general or limited partnership interests, limited liability company interests, or other equity, ownership, or profits interests (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Facility**" means the new senior secured term loans to be made by the holders of Sheridan I RBL Claims and Sheridan I Term Loan Claims in accordance with the Exit Facility Credit Agreement.

"**Exit Facility Credit Agreement**" means the credit agreement governing the Exit Facility, which shall be consistent with the Exit Facility Term Sheet.

"**Exit Facility Documents**" means the Exit Facility Credit Agreement and any other documentation necessary to effectuate the incurrence of the Exit Facility.

"**Exit Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Financing Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of consensual use of cash collateral, including the Segregated Cash, and any documentation related thereto.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file, and which are reasonably acceptable in form and substance to the Required Consenting Lenders.

"**Governing Body**" means the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of an Entity. As of the Execution Date, the Governing Body of each Company Party is the investment committee of Manager, and, when acting within the authority delegated to them by the investment committee, the special committees of SPP I-A, SPP I-B, SPP I-M, and SIP I, respectively.

"**Hedging Contract**" means any futures contract, forward contract, swap contract, derivative contract, hedging contract, or other like instrument with a Company Party.

"**HoldCo**" has the meaning set forth in the preamble to this Agreement.

"**ICM**" has the meaning set forth in the preamble to this Agreement.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Manager**" has the meaning set forth in the preamble to this Agreement.

"**Manager Affiliate**" has the meaning set forth in the preamble to this Agreement.

"**Manager Parties**" means Manager, Warburg, and each of the Manager Affiliates.

"**Milestones**" means the milestones set forth in Section 4 of this Agreement.

"**New Board**" means the board of directors or board of managers of New Sheridan.

"**New Organizational Documents**" means the documents providing for corporate governance of New Sheridan and the other Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which shall be consistent with section 1123(a)(6) of the Bankruptcy Code (as applicable).  The New Organizational Documents shall include a ROFO with respect to New Sheridan Equity.

"**New Sheridan**" means, subject to the Description of Transaction Steps, the newly-formed corporation, limited liability company, and/or other legal entity that will be taxed as a corporation for U.S. federal income tax purposes and will become the ultimate parent of the Reorganized Debtors and the issuer of the New Warrants under the Plan.

"**New Sheridan Equity**" means, subject to the Description of the Transaction Steps, the new common stock, new membership units, or other equity interests of New Sheridan or a direct or indirect subsidiary of New Sheridan issued on the Plan Effective Date.

"**New Warrants**" means those certain warrants to purchase New Sheridan Equity of New Sheridan on the terms set forth in the New Warrant Term Sheet.

"**New Warrant Documents**" means all documentation required to issue and distribute the New Warrants, which shall be in all respects consistent with the New Warrant Term Sheet.

"**New Warrant Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any governmental authority.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Petition Date Milestone**" means the date set forth in Section 4(b) of this Agreement.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**RBL Agent**" means Bank of America, N.A. in its capacity as administrative agent under the Sheridan I RBL Credit Agreements.

"**Related Party**" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"**Released Claim**" means, with respect to any Releasing Party, any Claim, or Cause of Action that is released by such Releasing Party under Section 13 of this Agreement.

"**Released Company Parties**" means, each of, and in each case in its capacity as such: (a) each Company Party; (b) each current and former Affiliate of each Entity in clause (a) through the following clause (c); and (c) each Related Party of each Entity in clause (a) through this clause (c).

"**Released Parties**" means each Released Company Party and each Released Stakeholder Party.

"**Released Stakeholder Parties**" means, each of, and in each case in its capacity as such: (a) each Consenting Stakeholder; (b) each Agent; (c) each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) each Related Party of each Entity in clause (a) through this clause (d), which shall be deemed to include in the case of clause (a), and solely for the purposes of this Agreement, the Related Parties of the Term Loan Group .

"**Releases**" means the releases contained in Section 13 of this Agreement.

"**Releasing Parties**" means, collectively, each Company Releasing Party and each Consenting Stakeholder Releasing Party.

"**Reorganized Debtors**" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Plan Effective Date.  For purposes of this Agreement, New Sheridan shall be deemed to be a Reorganized Debtor.

"**Required Consenting Lenders**" means Consenting Lenders collectively holding greater than 50% of the aggregate outstanding principal amount of Sheridan I RBL Claims and Sheridan I Term Loan Claims held by all Consenting Lenders.

"**Required Consenting Stakeholders**" means, collectively, each of the Required Consenting Lenders and each of the Manager Parties.

"**Restricted Period**" means the period commencing as of the date each Consenting Stakeholder, as applicable, executes this Agreement until the Termination Date, as to such Consenting Stakeholder.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**ROFO**" means a right of first offer with respect to the New Sheridan Equity to be set forth in the New Organizational Documents, which right of first offer shall (i) terminate by no later than September 30, 2021, (ii) be no more restrictive to the transferring holder than the terms set forth on **Exhibit E** attached to this Agreement and (iii) otherwise be acceptable to holders of at least sixty-two percent (62%) of aggregate principle amount of Sheridan I RBL Claims and Sheridan I Term Loan Claims held by all Consenting Lenders.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of Regulation D under the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Segregated Cash**" means the cash of the Debtors that represents the proceeds of certain asset sales which cash is held in segregated collateral accounts.

"**Services Agreement**" means a transition services agreement, by and among New Sheridan and Manager, which shall be either (a) in a form included in the Plan Supplement and reasonably acceptable to Manager and the Required Consenting Lenders or (b) if not included in the Plan Supplement, as reasonably agreed between Manager and the New Board.

"**Sheridan I RBL Claims**" means any Claim on account of the Sheridan I RBL Facilities.

"**Sheridan I RBL Credit Agreements**" means collectively, each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a)     that certain second amended and restated credit agreement dated as of April 20, 2010 among SIP I as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the lenders party thereto (the facility thereunder, the "**SIP I RBL Facility**");

(b)     that certain second amended and restated credit agreement dated as of April 20, 2010 among SPP I-A as borrower, Bank of America , N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the lenders party thereto (the facility thereunder, the "**SPP I-A RBL Facility**"); and

(c)     that certain second amended and restated credit agreement dated as of April 20, 2010 among SPP I-M as borrower, Bank of America, N.A., as administrative agent and collateral agent (together with any successor administrative or collateral agent), and the lenders party

thereto (the facility thereunder, the "**SPP I-M RBL Facility**," and, collectively with the SIP I RBL Facility and the SPP I-A RBL Facility, the "**Sheridan I RBL Facilities**").

"**Sheridan I RBL Forbearance Agreements**" means, collectively, each Limited Forbearance Agreement dated as of May 17, 2019, among certain of the Company Parties, the lenders party thereto, and Bank of America, N.A. as administrative agent, and collateral agent, as amended, restated, supplemented, or otherwise modified from time to time.

"**Sheridan I Term Loan Claims**" means, collectively, any Claim on account of the Sheridan I Term Loan Facilities, including, for the avoidance of doubt, any Deferred Principal Obligations (as defined in the Sheridan I Term Loan Credit Agreements).

"**Sheridan I Term Loan Credit Agreements**" means collectively, each of the following, as amended, restated, supplemented or otherwise modified from time to time:

(a)      that certain senior secured term loan credit agreement dated as of April 20, 2010 among SIP I as borrower, UBS AG, Stamford Branch, as administrative agent (together with any successor administrative agent), and the lenders party thereto (the facility thereunder, the "**SIP I Term Loan Credit Facility**");

(b)      that certain senior secured term loan credit agreement dated as of April 20, 2010 among SPP I-A, as borrower, UBS AG, Stamford Branch, as administrative agent (together with any successor administrative agent), and the lenders party thereto (the facility thereunder, the "**SPP I-A Term Loan Credit Facility**" ); and

(c)      that certain senior secured term loan credit agreement dated as of April 20, 2010 among SPP I-M, as borrower, UBS AG, Stamford Branch, as administrative agent (together with any successor administrative agent), and the lenders party thereto (the facility thereunder, the "**SPP I-M Term Loan Credit Facility**," and, collectively with the SIP I Term Loan Credit Facility and the SPP I-A Term Loan Credit Facility, the "**Sheridan I Term Loan Facilities**").

"**Sheridan I Term Loan Forbearance Agreements**" means, collectively the Forbearance Agreement and Amendment No. 12 to Fifth Amendment and Limited Waiver agreements, dated as of September 30, 2019, among certain of the Company Parties, the lender parties thereto, and Bank of America, N.A. as collateral agent, as amended, restated, supplemented, or otherwise modified from time to time.

"**SIP I**" has the meaning set forth in the preamble to this Agreement.

"**SMG**" has the meaning set forth in the preamble to this Agreement.

"**SMG I Carry**" has the meaning set forth in the preamble to this Agreement.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan.

"**SPC**" has the meaning set forth in the preamble to this Agreement.

"**SPP I-A**" has the meaning set forth in the preamble to this Agreement.

"**SPP I-B**" has the meaning set forth in the preamble to this Agreement.

"**SPP I-M**" has the meaning set forth in the preamble to this Agreement.

"**Term Loan Group**" means the group or committee of Consenting Sheridan I Term Lenders represented by Davis Polk & Wardwell LLP.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04, or 11.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached to this Agreement as **Exhibit C**.

"**Warburg**" has the meaning set forth in the preamble to this Agreement.

"**Wind-Down Budget**" means a budget, attached hereto as **Exhibit B**, setting forth the estimated costs and expenses of winding down the Debtors' estates following the Plan Effective Date, which shall be included in the Services Agreement.

"**Wind-Down Severance Amount**" means up to $4,400,000 of corporate (non-field) severance costs associated with employee terminations by SPC.

"**WPS**" has the meaning set forth in the preamble to this Agreement.

1.02.   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, including, for the avoidance of doubt in Section 3 hereof, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)       unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; notwithstanding the foregoing, any capitalized terms in this Agreement that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)       unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;

(f)       the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)       captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)       references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)       the phrase "counsel to the Term Loan Group" refers to Davis Polk & Wardwell LLP;

(j)       the phrase "counsel to the RBL Agent" refers to Vinson & Elkins LLP;

(k)       the phrase "counsel to the Company Parties" refers to Kirkland & Ellis LLP; and

(l)       the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.** *Effectiveness of this Agreement.* This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)       each of the Company Parties and the Manager Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties, counsel to the Term Loan Group, and counsel to the RBL Agent;

(b)       the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties, counsel to the Term Loan Group and counsel to the RBL Agent:

(i)       holders of more than two-thirds of the aggregate outstanding principal amount of the Sheridan I RBL Claims; and

(ii)      holders of more than two-thirds of the aggregate outstanding principal amount of the Sheridan I Term Loan Claims; and

(c)      the Company Parties shall have paid all Consenting Lender Fees and Expenses that are due and payable as of the Agreement Effective Date; *provided*, *however*, that the Company Parties shall have received an invoice for such Consenting Lender Fees and Expenses at least three (3) Business Days prior to the Agreement Effective Date.

**Section 3.**      *Definitive Documents.*

3.01.   The Definitive Documents governing the Restructuring Transactions shall include the following: (A) the Plan (and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto), including any "Definitive Documentation" as defined therein and not explicitly so defined herein; (B) the Confirmation Order; (C) the Financing Order; (D) the Disclosure Statement; (E) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (F) the First Day Pleadings and all orders sought pursuant thereto; (G) the Plan Supplement; (H) any and all documentation required to implement, issue, and distribute the New Sheridan Equity; (I) the New Warrant Documents; (J) the Services Agreement; (K) the Exit Facility Documents; and (L) the New Organizational Documents.

3.02.   The Definitive Documents that are not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants not inconsistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12. Further, the Definitive Documents that are not executed or in a form attached to this Agreement as of the Execution Date, and any amendments thereto, shall be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Lenders. Notwithstanding anything herein to the contrary, the Financing Order, the Plan (including any amendment thereto), the New Warrant Documents, the Exit Facility Documents, the Services Agreement and the New Organizational Documents shall, in each case, be acceptable to the Required Consenting Lenders.

**Section 4.**      *Milestones.*  The following Milestones shall apply to this Agreement unless extended or waived in writing by the Company Parties and the Required Consenting Lenders:

(a)      no later than 5 business days before the Petition Date, the Company Parties shall commence solicitation of votes on the Plan;

(b)      no later than March 24, 2020, the Petition Date shall have occurred;

(c)      no later than 5 days after the Petition Date, the Financing Order shall have been entered on an interim basis; and

(d)      no later than March 31, 2020, (i) the Financing Order shall have been entered on a final basis, (ii) the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement, and (iii) the Plan Effective Date shall have occurred.

**Section 5.**      *Commitments of the Consenting Lenders.*

5.01.   <u>Affirmative Commitments</u>.   During the Agreement Effective Period, each Consenting Lender severally, and not jointly, agrees in respect of all of its Company Claims/Interests to:

(a)      support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)      give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions;

(c)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are not inconsistent with this Agreement to which it is required to be a party or to which it has consent right pursuant to Section 3.02; and

(d)      negotiate in good faith any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring Transactions.

5.02.   <u>Negative Commitments</u>.   During the Agreement Effective Period, each Consenting Lender severally, and not jointly, agrees in respect of all of its Company Claims/Interests that it shall not, directly or indirectly, and shall not direct any other Entity to:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(c)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(d)      take (directly or indirectly), or direct any Agent to take, any Enforcement Actions or exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims/Interests including rights or remedies arising from or asserting or bringing any claims under or with respect to the Sheridan I RBL Facilities or Sheridan I Term Loan Facilities;

(e)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(f)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.03.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)      During the Agreement Effective Period, each Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Lender, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)      vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)      to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above;

(iv)      not directly or indirectly, through any Person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; *provided* that nothing in this Section 5.03(a)(iv) shall affect any rights of the Consenting Lenders set forth in Section 7.03(b); and

(v)      support and take all actions reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

(b)      During the Agreement Effective Period, each Consenting Lender, in respect of each of its Company Claims/Interests, severally, and not jointly, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is not inconsistent with this Agreement.

5.04.   <u>Forbearance Agreements</u>.

(a)     Each Consenting Sheridan I RBL Lender, by signing this Agreement, (i) agrees to extend the Forbearance Period (as defined in each of the Sheridan I RBL Forbearance Agreements) through the earlier of the Petition Date Milestone or the Petition Date and (ii) consents to the payment by the Company Parties to SPC by no later than March 26, 2020, of the Wind-Down Severance Amount in accordance with the Wind-Down Budget; *provided* that it is understood and agreed that the Wind-Down Severance Amount shall not count towards the $10 million cap on Fund I Operating Cash (as defined in the applicable Sheridan I RBL Credit Agreement.)

(b)    Each Consenting Sheridan I Term Lender, by signing this Agreement, agrees (i) to extend the Forbearance Period (as defined in each of the Sheridan I Term Loan Forbearance Agreements) through the earlier of the Petition Date Milestone or the Petition Date and (ii) consents to the payment by the Company Parties to SPC by no later than March 26, 2020, of the Wind-Down Severance Amount in accordance with the Wind-Down Budget; *provided* that it is understood and agreed that the Wind-Down Severance Amount shall not count towards the $10 million cap on Fund I Operating Cash (as defined in the applicable Sheridan I Term Loan Credit Agreement).

(c) Notwithstanding anything herein to the contrary, all parties' respective rights under the Sheridan I RBL Forbearance Agreements and the Sheridan I Term Loan Forbearance Agreements are reserved.

5.05.   <u>Hedging Contracts</u>.   To the extent any Consenting Lender holds Hedging Contracts, during the Agreement Effective Period, such Consenting Lender agrees to not take any action to exercise remedies with respect to the Hedging Contracts unless otherwise agreed by the Company Parties and such Consenting Lender.

5.06.   <u>Additional Provisions Regarding the Consenting Lenders' Commitments</u>. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)     be construed to prohibit any Consenting Lender from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere or impede, directly or indirectly, the Restructuring Transactions;

(b)     affect the ability of any Consenting Lender to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(c)     impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(d)      prevent any Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or

(e)      obligate a Consenting Lender to deliver a vote to support the Plan or prohibit a Consenting Lender from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); it being understood that upon the Termination Date as to a Consenting Lender (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such Consenting Lender's vote shall automatically be deemed void *ab initio* and such Consenting Lender shall have a reasonable opportunity to cast a vote.

**Section 6.**      *Commitments of the Manager Parties*.

6.01.      <u>Affirmative Commitments</u>.  During the Agreement Effective Period, each of the Manager Parties severally, and not jointly, agrees to:

(a)      support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(b)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are not inconsistent with this Agreement to which it is required to be a party; and

(c)      negotiate in good faith any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring Transactions.

6.02.      <u>Negative Commitments.</u> During the Agreement Effective Period, each of Manager Parties severally, and not jointly, agrees that it shall not, directly or indirectly, and shall not direct any other Entity to:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(c)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Plan;

(d)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions

contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; or

(e)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

6.03.   <u>Commitments with Respect to Chapter 11 Cases.</u>  During the Agreement Effective Period, each of the Manager Parties severally, and not jointly, agrees that it, for the duration of the Agreement Effective Period, shall:

(a)     if solicited, timely vote or cause to be voted its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot or ballots on a timely basis following the commencement of the solicitation;

(b)     not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in clause (a) above or release described in clause (c) below;

(c)     agree to provide, and to not opt out of or object to, the releases set forth in the Plan against each Released Party;

(d)     if solicited, timely vote (or cause to be voted) its Company Claims/Interests against any Alternative Restructuring Proposal;

(e)     not directly or indirectly, through any Person, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; and

(f)     support and take all actions necessary or reasonably requested by the Company Parties to facilitate the solicitation, approval of the Disclosure Statement, and confirmation and consummation of the Plan within the timeframes contemplated by this Agreement.

6.04.   <u>Additional Provisions Regarding the Manager Parties' Commitments.</u>

(a)     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(i)     impair or waive the rights of any Manager Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(ii)     affect the ability of any Manager Party to consult with any Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(iii)    restrict any representative or Governing Body of any Company Party, or any Manager Party in its capacity as manager or operator of any Company Party, from exercising its rights under Sections 7.03 or 11.02(b) of this Agreement or causing a Company Party or the Governing Body of a Company Party to exercise its rights under such provisions;

(iv)    restrict any Manager Party in its capacity as the manager or operator of fund Entities other than the Company Parties; or

(v)     prevent any Manager Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

(b)     Notwithstanding anything to the contrary in this Agreement, in no event shall a Manager Party be liable for money damages for any breach of this Agreement, and any remedy by any Party against a Manager Party for any breach of this Agreement shall be limited to specific performance pursuant to Section 14.14; *provided*, *however*, that in no event shall a Manager Party be liable to any other Manager Party for any breach of this Agreement, whether for money damages, specific performance, or otherwise.  In the event of a breach by any Manager Party of any representation, warranty, covenant, or other provision of this Agreement that gives rise to a termination right under Section 11.01, then, upon notice to the Parties prior to the Plan Effective Date in accordance with Section 14.10, the Releases by and in favor of such Manager Party shall be fully revoked and deemed null and void.

**Section 7.**     ***Commitments of the Company Parties.***

7.01.   <u>Affirmative Commitments</u>.   Except as set forth in Section 7.03, during the Agreement Effective Period, each of the Company Parties agrees to:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, support and take all steps reasonably necessary and desirable to address any such impediment;

(c)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      (i) provide counsel for the Consenting Lenders a reasonable opportunity (which, to the extent reasonably practicable, shall be no less than two (2) Business Days) to review draft copies of all pleadings, motions, and proposed orders (including without limitation the First Day Pleadings and all "second day" motions) that affect or may affect the Consenting Lenders and, (ii) provide a reasonable opportunity (which, to the extent reasonably practicable, shall be no less than two (2) Business Days) to counsel to the Term Loan Group and counsel to the RBL Agent to review draft copies of other documents that the Company Parties intend to file with the Bankruptcy Court if such a filing affects or may affect any Consenting Lender, as applicable;

(f)      actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(g)      consult and negotiate in good faith with the Consenting Stakeholders and their advisors regarding the execution of Definitive Documents and the implementation of the Restructuring Transactions;

(h)      upon reasonable request of the Consenting Lenders, inform counsel to the Term Loan Group and counsel to the RBL Agent as to:  (i) the material business and financial (including liquidity) performance of the Company Parties; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Lender, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i)      inform counsel to the Term Loan Group and counsel to the RBL Agent as soon as reasonably practicable after becoming aware of:  (i) any matter or circumstance which any of them know, or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party; (iii) a breach of this Agreement (including a breach by any Company Party); and (iv) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made;

(j)      use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized; and

(k)      use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent and, to the extent the Company Parties receive any Joinders or Transfer Agreements, to notify counsel to the Term Loan Group and counsel the RBL Agent of such Joinders and Transfer Agreements.

7.02.   Negative Commitments.   Except as set forth in Section 7.03, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement, the Plan or the Definitive Documents;

(d) modify any Definitive Document, in whole or in part, in a manner that is inconsistent with this Agreement;

(e) (i) operate its business outside the ordinary course, taking into account the Restructuring Transactions, without the consent of the Required Consenting Lenders or (ii) transfer any asset or right of the Company Parties or any asset or right used in the business of the Company Parties to any person or entity outside the ordinary course of business without the consent of the Required Consenting Lenders;

(f) take, or fail to take, any action that would cause a change to the tax status of any Company Party; or

(g) engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside of the ordinary course of business, other than the transactions contemplated herein and on the terms hereof .

7.03.   Additional Provisions Regarding Company Parties' Commitments.

(a)      Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the Governing Body of a Company Party to take or refrain from taking any action with respect to the Restructuring Transaction (including terminating this Agreement under Section 11) to the extent such person or persons determines, based on the advice of counsel, that taking or refraining from taking such action, as applicable, that would be inconsistent with applicable Law or its fiduciary obligations under applicable Law. The Company Parties shall give prompt written notice to the Consenting Stakeholders of any determination made in accordance with this Section 7.03(a).   This Section 7.03(a) shall not impede any Party's right to terminate this Agreement pursuant to Section 11, including, for the avoidance of doubt, the Consenting Lenders' rights to terminate in accordance with Section 11.01.

(b)      Notwithstanding anything to the contrary in this Agreement, upon receipt of an unsolicited Alternative Restructuring Proposal, each Company Party and their respective

directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives (including any Governing Body members) shall have the rights to:  (i) consider, respond to, and facilitate such Alternative Restructuring Proposal; (ii) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity in connection with such proposal; (iii) maintain or continue discussions or negotiations with respect to such Alternative Restructuring Proposal; (iv) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of such Alternative Restructuring Proposal; and (v) enter into or continue discussions or negotiations with holders of Company claims/Interests (including any Consenting Stakeholder) regarding the Restructuring Transactions or such Alternative Restructuring Proposal; *provided* that if any Company Party, receives an unsolicited Alternative Restructuring Proposal, then such Company Party shall (A) within one business day of receiving such proposal, notify counsel to the Term Loan Group and counsel to the RBL Agent of the receipt of such proposal; (B) provide counsel to the Term Loan Group and counsel to the RBL Agent with regular updates as to the status and progress of such Alternative Restructuring Proposal; and (C) use commercially reasonable efforts to respond promptly to reasonable information requests and questions from counsel to the Term Loan Group and counsel to the RBL Agent relating to such Alternative Restructuring Proposal.

(c)     Nothing in this Agreement shall: (i) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the implementation of the Restructuring Transactions; (ii) affect the ability of any Company Party to consult with any Consenting Stakeholder or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); or (iii) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Company Claims/Interests.*

8.01.   During the Restricted Period, no Consenting Stakeholder shall Transfer any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      the transferee is either (i) a qualified institutional buyer as defined in Rule 144A under the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined in Regulation S under the Securities Act, or (iii) an institutional accredited investor (as defined in the Rules), and in each case that executes and delivers to the applicable Agent and counsel to the Company Parties, at or before the time of the proposed Transfer, a fully executed Transfer Agreement; or

(b)      the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor of any Company Claims/Interests shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests.   Notwithstanding the foregoing, (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties, counsel to the Term Loan Group or counsel to the RBL Agent) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.   Notwithstanding anything to the contrary in this Agreement, if a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is permitted under Section 8.01.  If a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**      *Representations and Warranties of Company Parties and Consenting Lenders.*

9.01.   Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)      it is the beneficial or record owner of the aggregate principal amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)      it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      (i) it is either (A) a qualified institutional buyer as defined in the provisions of Rule 144A promulgated under the Securities Act, (B) not a U.S. person (as defined in Regulation S under the Securities Act), or (C) an institutional accredited investor (as defined in the Rules under the Securities Act), and in each case is able to bear the risk of its investment in the Company Claims/Interests, and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions (A) will have been acquired for investment for its own account and not with a view to distribution or resale in violation of the Securities Act and (B) will not have been registered under the Securities Act or under the "blue sky" laws of any jurisdiction and may be resold or transferred only if registered pursuant to the provisions of the Securities Act (or if eligible, pursuant to the provisions of Rule 144 promulgated under the Securities Act or pursuant to another available exemption from the registration requirements of the Securities Act); and

(e)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law.

9.02.   Each Company Party severally, and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)      other than as set forth on Schedule 1 hereto (which shall be updated with any litigation that becomes pending against any Company Party between the date hereof and the Plan Effective Date), there is no litigation pending or, to any Company Party's knowledge, any material litigation threatened in writing, against any Company Party, or, to any Company Party's

knowledge, the subject of which is any Oil and Gas Property of any Company Party (including pending litigation or material litigation threatened in writing against any Manager Party related to any Company Party), including, to any Company Party's knowledge, any pending litigation challenging or otherwise pertaining to any Company Party's title to any Oil and Gas Property or any Company Party's rights to produce and sell oil and gas therefrom;

(b)      the Company Parties have insurance of the kinds and in such amounts as are customarily carried or maintained by similarly situated companies engaged in similar businesses. All such insurance is provided by insurers with credit quality customary for insurers of persons similar to the Company Parties and engaged in similar businesses. The Collateral Agent is named as an additional insured, mortgagee and loss payee, as applicable, on each insurance policy as required by the Sheridan I Term Loan Credit Agreements and Sheridan I RBL Credit Agreement; and

(c)      the representations and warranties contained in the Sheridan I Term Loan Credit Agreements and Sheridan I RBL Credit Agreements with respect to ERISA Plans and Pension Plans (as each is defined in such credit agreements) are true and correct in all material respects.

**Section 10.**      *Mutual Representations and Warranties*.   Each Party hereto, severally and not jointly, represents and warrants that, as of the date such Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(f)      to the extent a Party is a Releasing Party, such Party has not assigned, conveyed, sold, hypothecated or otherwise transferred all, any part of or any interest in any Cause of Action that would be a Released Claim hereunder.

**Section 11.**    *Termination Events*.

11.01.  <u>Consenting Lender Termination Events</u>.  The Required Consenting Lenders may terminate this Agreement upon prior written notice to all Parties in accordance with Section 14.10 of this Agreement upon the occurrence of any of the following events:

(a)      the breach in any material respect by a Company Party or Manager Party of any of the representations, warranties, or covenants of such Company Party or Manager Party set forth in this Agreement that would have, or could reasonably be expected to have, an adverse effect on the Restructuring Transaction, which breach remains uncured for five (5) Business Days after such terminating Required Consenting Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such breach;

(b)      any of the Company Parties files or otherwise makes public any of the Definitive Documents (including any modification or amendments thereto) (i) in a form that is materially inconsistent with this Agreement and (ii) without the consent of the applicable Required Consenting Lenders in accordance with this Agreement, which occurrence remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Lender transmits a written notice in accordance with Section 14.10;

(c)      the Company Parties (i) withdraw the Plan, (ii) announce their intention not to support the Restructuring Transactions or (iii) announce, or execute a definitive written agreement with respect to an Alternative Restructuring Proposal;

(d)      any of the Company Parties (i) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Sheridan I RBL Claims or Sheridan I Term Loan Claims, lien, or interest held by any Consenting Lender arising under or relating to the Sheridan I RBL Credit Agreements or Sheridan I Term Loan Credit Agreements or (ii) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(e)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) Business Days after such terminating Consenting Lenders transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that

27

sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order;

(g)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases of a Company Party, (iv) terminating exclusivity under Section 1121 of the Bankruptcy Code, or (v) rejecting this Agreement;

(h)     if any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as expressly contemplated by this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (i), (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Company Party or for a substantial part of such Company Party's assets, (iv) makes a general assignment or arrangement for the benefit of creditors, or (v) takes any corporate action for the purpose of authorizing any of the foregoing; or

(i)     the failure to meet a Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement.

11.02.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 of this Agreement upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting Lenders of any of the representations, warranties, or covenants of the Consenting Lenders set forth in this Agreement that would have, or could reasonably be expected to have, an adverse effect on the Restructuring Transaction, which breach remains uncured for five (5) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 of this Agreement detailing any such breach, but only if the non-breaching Consenting Lenders hold less than two thirds of the Sheridan I RBL Claims and Sheridan I Term Loan Claims, calculated separately;

(b)      the Governing Body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order; or

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right shall not apply to or be exercised by any Company Party if any Company Party or Manager Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

11.03.   <u>Manager Entity Termination Events.</u>   This Agreement may be terminated by a Manager Party in respect of such Manager Party by delivery to the Company Parties of a written notice in accordance with Section 14.10 of this Agreement upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party or Consenting Lender of any of the representations, warranties, or covenants of the Company Parties or Consenting Lender, as applicable, set forth in this Agreement that (i) adversely affects the treatment, right or obligations under this Agreement or the Plan of any Manager Parties and (ii) remains uncured for five (5) Business Days after such terminating Manager Parties transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such breach; or

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for five (5) Business Days after such terminating Manager Parties transmit a written notice in accordance with Section 14.10 of this Agreement detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Manager Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement.

11.04.   <u>Mutual Termination</u>.   This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.05.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.06.  <u>Effect of Termination.</u>  After the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action that otherwise would have been subject to the Releases, subject to Section 14.21 herein.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise. Notwithstanding the foregoing, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with the terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or 11.04.  Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b) or affect any Party's rights under Section 14.21.

**Section 12.**   *Amendments and Waivers.*

(a)     This Agreement, including the form of Plan attached hereto, may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12; *provided* that the foregoing shall not modify or enlarge any Party's consent rights with respect to Definitive Documents as set forth in Section 3 of this Agreement.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in writing signed by:  (i) each Company Party, (ii) the Required Consenting Lenders, and (iii) each Manager Party; *provided* that, (i) in the case of the Manager Parties, the Manager Parties' consent shall not be required as to any modification, amendment, waiver, or supplement that does not materially and adversely affect their rights, and unless otherwise specified in this Agreement and (ii) any modification or amendment to this Agreement or the Plan that (A) requires a re-solicitation of the Plan, (B) changes the principal amount of the Exit Facility, the maturity of the Exit Facility, the asset sale covenant of the Exit Credit Agreement or the requirement to engage, and the obligations owed by the borrower under the Exit Facility to, the asset disposition advisor, in each case, as set forth in the Exit Facility Term Sheet, (C) materially changes the terms of the New Warrants, (D) changes clause (i), clause (ii) or clause (iii) of the definition of "ROFO" set forth in this Agreement or (E) changes the composition of the New Board or the compensation owed to the New Board, in each case, as provided for in clause (K) of Article (IV) of the Plan, shall in each case require the prior written (including by email) approval of holders of at least two-thirds of the aggregate outstanding principal amount of Sheridan I RBL Claims and Sheridan I Term Loan Claims held by all Consenting Lenders.

(c)     Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.     *Mutual Releases.***

13.01.   Releases.

(a)     Releases by the Company Releasing Parties.  Except as expressly set forth in this Agreement, effective on (i) the Agreement Effective Date and (ii) the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Company Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims asserted on behalf of the Company Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or

otherwise, that the Company Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Company Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Company Parties, their capital structure, the assertion or enforcement of rights and remedies against the Company Parties' out-of-court restructuring efforts, intercompany transactions between or among a Company Party and another Company Party, the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement or the Definitive Documents, the pursuit of consummation, the administration and implementation of the Restructuring Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Company Parties taking place on or before, in respect of the foregoing clause (i), the Agreement Effective Date and, in respect of the foregoing clause (ii), the Plan Effective Date.

(b)     Releases by the Consenting Stakeholder Releasing Parties.  Except as expressly set forth in this Agreement, effective on (i) the Agreement Effective Date and (ii) the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Consenting Stakeholder Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Company Parties, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Company Parties, their capital structure, the assertion or enforcement of rights and remedies against the Company Parties' out-of-court restructuring efforts, intercompany transactions between or among a Company Party and another Company Party, the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement or the Definitive Documents, the pursuit of consummation, the administration and implementation of the Restructuring Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Company Parties taking place on or before, in respect of the foregoing clause (i), the Agreement Effective Date and, in respect of the foregoing clause (ii), the Plan Effective Date.

13.02. No Additional Representations and Warranties.  Each of the Parties agrees and acknowledges that, except as expressly provided in this Agreement and the Definitive Documents, no other Party, in any capacity, has warranted or otherwise made any representations concerning any Released Claim (including any representation or warranty concerning the existence, non-existence, validity, or invalidity of any Released Claim).  Notwithstanding the foregoing, nothing contained in this Agreement is intended to impair or otherwise derogate from

32

any of the representations, warranties, or covenants expressly set forth in this Agreement or any of the Definitive Documents.

13.03.  <u>Release of Unknown Claims</u>.   Each of the Releasing Parties in each of the Releases contained in this Agreement expressly acknowledges that although ordinarily a general release may not extend to Released Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives and relinquishes any and all rights such Party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the Release or which may in any way limit the effect or scope of the Releases with respect to Released Claims which such Party did not know or suspect to exist in such Party's favor at the time of providing the Release, which in each case if known by it may have materially affected its settlement with any Released Party including any rights under Section 1542 of the California Civil Code or any analogous applicable state or federal law or regulation.  Each of the Releasing Parties expressly acknowledges that the Releases and covenants not to sue contained in this Agreement are effective regardless of whether those released matters or Released Claims are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.

To the extent that the foregoing releases are releases to which Section 1542 of the California Civil Code or similar provisions of other applicable law applies, it is the intention of the Parties that the foregoing releases shall be effective as a bar to any and all Claims of whatsoever character, nature and kind, known or unknown, suspected or unsuspected specified in this Agreement. In furtherance of this intention, the Parties expressly waive any and all rights and benefits conferred upon them by the provisions of Section 1542 of the California Civil Code or similar provisions of applicable law, which are as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code was bargained for separately. Thus, notwithstanding the provisions of Section 1542 of the California Civil Code, and for the purpose of implementing a full and complete release and discharge of the Parties, and each of them, each Party expressly acknowledges that this Agreement is intended to include in its effect without limitation all of the claims, causes of action and liabilities which the Parties, and each of them do not know or suspect to exist in their favor at the time of execution of this Agreement, and this Agreement contemplates extinguishment of all such claims, causes of action and liabilities.

13.04.  Turnover of Subsequently Recovered Assets.  In the event that any Releasing Party (including any successor or assignee thereof), third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar Entity is successful in pursuing or receives, directly or indirectly, any funds, property, or other value on account of any Claim, Cause of Action, or litigation against any Released Party that was released pursuant to the Release, such Entity (i) shall not commingle any such recovery with any of its other assets and (ii) agrees that it shall promptly turnover and assign any such recoveries to, and hold them in trust for, such Released Party.

13.05.  Certain Limitations on Releases.  For the avoidance of doubt, nothing in this Agreement and the Releases contained in this Section 13 shall or shall be deemed to result in the waiving or limiting by (a) the Company Parties, the Manager Parties, or any officer, director, member of any Governing Body, or employee thereof of (i) any indemnification against any Company Party, any Manager Party, any of their insurance carriers, or any other Entity, (ii) any rights as beneficiaries of any insurance policies, (iii) wages, salaries, compensation, or benefits, (iv) intercompany claims, or (v) any Equity Interests in any Company Party, Manager Party, or any other Entity, (b) the Consenting Lenders or the Agents of any "Obligations" under and as defined in each of the Sheridan I RBL Credit Agreements, the Sheridan I Term Loan Credit Agreements, or any other financing document (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreement, or any other financing document under and as defined therein); (c) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan and the Exit Facility Credit Agreements, or any other financing document under and as defined therein); and (d) any party of any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, the Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility Documents, or any Claim or obligation arising under the Plan.

13.06.  Covenant Not to Sue.  Each of the Releasing Parties hereby further agrees and covenants not to, and shall not, commence or prosecute, or assist or otherwise aid any other Entity in the commencement or prosecution of, whether directly, derivatively or otherwise, any Released Claims.

**Section 14.  *Miscellaneous.***

14.01.  Acknowledgement.  Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached to this Agreement is expressly incorporated and made a

part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.  The Parties acknowledge and agree that they are not relying on any representations or warranties in entering into this Agreement other than as set forth in this Agreement.

14.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE CHOSEN STATE, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Chosen Court; *provided* that nothing in this Agreement shall prevent the Company Parties from commencing the Chapter 11 Cases in the Bankruptcy Court.  Solely in connection with claims arising under this Agreement, each Party to this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

14.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

14.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each Person executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and, except as set forth in Section 8, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

      c/o Sheridan Production Company, LLC
      1360 Post Oak Blvd., Suite 2500
      Houston, Texas 77056
      Attention:  Cheryl S. Phillips, Vice President and General Counsel
      E-mail address:  cheryl.phillips@sheridanproduction.com

      with copies to:

      Kirkland & Ellis LLP
      601 Lexington Avenue
      New York, New York 10022
      Attention:  Joshua Sussberg and Steven Serajeddini
      E-mail addresses:  joshua.sussberg@kirkland.com and
      steven.serajeddini@kirkland.com

      -and-

      Kirkland & Ellis LLP
      300 North LaSalle Street
      Chicago, Illinois 60654
      Attention:  Spencer Winters
      E-mail address: spencer.winters@kirkland.com

(b)      if to a Consenting Sheridan I RBL Lender, to:

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3900
Dallas, TX 75201-2975
Attn.:  William L. Wallander and Erec Winandy
E-mail addresses: ewinandy@velaw.com and bwallander@velaw.com

(c)  if to a Consenting Sheridan I Term Lender, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue,
New York, New York 10017
Attn.:  Damian S. Schaible, Nate Sokol, and Stephen D. Piraino
E-mail addresses: damian.schaible@davispolk.com,
stephen.piraino@davispolk.com, and nathaniel.sokol@davispolk.com

(d)  if to a Manager Affiliate, to:

Sheridan Production Company, LLC
1360 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Attention:  Cheryl S. Phillips, Vice President and General Counsel
E-mail address:  cheryl.phillips@sheridanproduction.com

(e)  if to Warburg, to:

Warburg Pincus LLC
450 Lexington Avenue
New York, NY  10017
Attention:  Harsha Marti
E-mail address:  harsha.marti@warburgpincus.com

-and-

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention: Brian Lennon
E-mail address: blennon@willkie.com

(f)  if to Manager, to:

Sheridan Production Company, LLC
1360 Post Oak Blvd., Suite 2500
Houston, Texas 77056
Attention:  Cheryl S. Phillips, Vice President and General Counsel
E-mail address:  cheryl.phillips@sheridanproduction.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  Independent Due Diligence and Decision Making.  Each Consenting Stakeholder confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.  Each Consenting Stakeholder acknowledges and agrees that it is not relying on any representations or warranties other than as set forth in this Agreement.

14.12.  Enforceability of Agreement.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  Admissibility.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3, Section 11, Section 12, or otherwise, including a written approval by the Company Parties, the Required Consenting Lenders, or the Manager Parties, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to, as applicable, the Company Parties, the Manager Parties, the Term Loan Group and the RBL Agent submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.20.  <u>Fees and Expenses</u>. Regardless of whether the Restructuring Transactions are or have been consummated, and subject to the terms of and solely to the extent authorized in the Financing Order and the Plan, the Company Parties shall promptly pay in cash all Consenting Lender Fees and Expenses; *provided*, *however*, that concurrently with the Agreement Effective Date, the Company Parties shall pay all Consenting Lender Fees and Expenses incurred at any time prior to the Agreement Effective Date not previously paid by the Company Parties.

14.21.  <u>Survival</u>.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with Section 8 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 11.06, Section 13, Section 14, and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof. Notwithstanding the foregoing, the Parties acknowledge and agree that (x) if this Agreement is terminated pursuant to either Section 11.02 or 11.04, Section 13 shall not survive such termination, and any and all Releases shall be fully revoked and deemed null and void and of no force and effect, and (y) if this Agreement is terminated pursuant to Sections 11.01 or 11.03, Section 13 shall survive such termination, except that any and all Releases received and granted by the Consenting Lenders (in case of a termination under Section 11.01) or a Manager Party (in the case of a termination under Section 11.03) shall be fully revoked and deemed null and void and of no force and effect.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

[*Remainder of page intentionally left blank.*]

**Company Parties' Signature Page to**
**the Restructuring Support Agreement**

SHERIDAN INVESTMENT PARTNERS I, LLC
SHERIDAN PRODUCTION PARTNERS I-A, L.P.
SHERIDAN PRODUCTION PARTNERS I-B, L.P.
SHERIDAN PRODUCTION PARTNERS I-M, L.P.
SHERIDAN HOLDING COMPANY I, LLC
SHERIDAN PRODUCTION PARTNERS I, LLC
SPP I-B GP, LLC

By: _____

Name: Lisa. L. Stewart

Authorized Signatory

**Manager and Manager Parties' Signature Page to
the Restructuring Support Agreement**

SHERIDAN PRODUCTION PARTNERS MANAGER, LLC

By:
Name: Lisa A. Stewart
Authorized Signatory

SHERIDAN ICM, LLC

By:
Name: Lisa A. Stewart
Authorized Signatory

SHERIDAN PRODUCTION COMPANY, LLC

By:
Name: Lisa A. Stewart
Authorized Signatory

SHERIDAN PRODUCTION COMPANY I, LLC

By:
Name: Lisa A. Stewart
Authorized Signatory

SHERIDAN SMG, LLC

By:
Name: Lisa A. Stewart
Authorized Signatory

SHERIDAN SMG I CARRY, LLC

By:
Name: Lisa A. Stewart
Authorized Signatory

WPS PRODUCTION PARTNERS, LLC

By:_____

Name: Robert B. Knauss

Title: Managing Director

WARBURG PINCUS, LLC

By:_____

Name: Robert B. Knauss

Title:   Managing Director

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
ABN AMRO CAPITAL USA LLC**

Name:
Title:
Antonio Molestina
Managing Director

Name: Francis Ballard Jr.
Title: Director,

Address:

100 Park Avenue
New York, NY 10017

E-mail address(es):   francis.ballard@abnamro.com
hugo.diogo@abnamro.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
ASSOCIATED BANK, N.A.**



Name:   Brett P. Stone
Title:     Senior Vice President

Address:  300 E. Kilbourn Avenue, Suite 200
                Milwaukee, WI  53202

E-mail address(es): brett.stone@associatedbank.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Bank of America N.A.,** ("**Bank**") solely in respect of GBAM Special Assets Group ("**Group**") and not any other desk, unit, group, division, or affiliate of Bank, as a Consenting Lender.

For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Agreement, the term "Consenting Lender" and "Consenting Stakeholder" shall not include any distinct business unit of Bank other than the Group unless such other business unit is or becomes a party to this Agreement.

Name: Kevin M. Behan
Title: Managing Director

Address:
Bank of America
NY1-050-08-04 50
Rockefeller Plaza
New York, NY 10020-1605

E-mail address: kevin.m.behan@bofa.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
BMO HARRIS FINANCING, INC.**

Name: Melissa Guzmann
Title: Director

Address:     700 Louisiana St, Suite 2100
Houston, TX 77002

E-mail address(es): melissa.guzmann@bmo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
CITIBANK, N.A.**



Name: Jeff Ard
Title: Vice President

Address: 811 Main St, Ste 4000, Houston, TX 77002

E-mail address(es): jeff.ard@citi.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
ING CAPITAL LLC**

Name: Juli Bieser
Title:   Managing Director

Name: Charles Hall
Title:   Managing Director

Address: 1111 Bagby Street, Suite 2650, Houston, TX 77002

E-mail addresses: juli.bieser@ing.com | charles.hall@ing.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ROYAL BANK OF CANADA**



Name: Amy G. Josephson
Title: Authorized Signatory

Address: Three World Financial Center, 200 Vesey Street, 12th Floor, New York, New York 10281

E-mail address(es): les.vowell@rbccm.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
REGIONS BANK**

Name:   Lynn Johnston
Title:   Sr. Vice President

Address:   1717 McKinney
          Suite 1100
          Dallas, Texas 75202
E-mail address(es): lynn.johnston@regions.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
UBS AG, STAMFORD BRANCH**

Name:    Houssem Daly
Title:     Associate Director

Name:    Anthony Joseph
Title:     Associate Director

Address: 600 Washington Blvd. 10th Fl. Stamford, CT 06901


E-mail address(es):

primarysettlemts@ubs.com
ubsagency@ubs.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
WELLS FARGO BANK, N.A.**

Name: Christine Gardiner
Title: Director

Address: 301 S. College St | Charlotte, NC 28202|MAC D1053-151

E-mail address(es): christine.m.gardiner@wellsfargo.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**UBS AG, STAMFORD BRANCH**

Houssem Daly
Associate Director
Banking Products Services, US

Name: DARLENE ARIAS

Title: DIRECTOR

Address: 600 Washington Blvd, 10th Floor
Stamford, CT 06902

E-mail address(es): SH-BPSiNTRALINKS@UBS.COM

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CROWN POINT CLO 5 LTD.
by PRETIUM CREDIT MANAGEMENT LLC as
COLLATERAL MANAGER**

Name: Paul Arzouian
Title: Authorized Signatory

Address: 810 7th Avenue, 24th Floor, New York, NY  10019

E-mail address(es): parzouian@pretium.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CROWN POINT CLO 6 LTD.
by PRETIUM CREDIT MANAGEMENT LLC as
COLLATERAL MANAGER**

Name: Paul Arzouian
Title: Authorized Signatory

Address: 810 7th Avenue, 24th Floor, New York, NY  10019

E-mail address(es): parzouian@pretium.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**CCP Credit Acquisition Holdings, L.L.C.**

Name: Richard Grissinger
Title:   Authorized Signatory

Address:

c/o Centerbridge Partners, L.P.

375 Park Avenue 11th fl.

New York, NY 10152

E-mail address(es): closing@centerbridge.com; jdavis@centerbridge.com

\

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Centerbridge Special Credit Partners III, L.P.**



Name:  Richard Grissinger
Title:   Authorized Signatory

Address:

c/o Centerbridge Partners, L.P.

375 Park Avenue 11th fl.

New York, NY 10152

E-mail address(es): closing@centerbridge.com; jdavis@centerbridge.com

\

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**INDUSTRIAL AND COMMERCIAL BANK OF CHINA LIMITED, NEW YORK
BRANCH**

Digitally signed by:
Yuqiang Xiao
Date: 2020.02.20 18:
50:45 -05'00'

Name:
Title:


Address: 725 5th Avenue, 20th Floor, New York, New York 10022


E-mail     address(es):     Joao.Carlos@us.icbc.com.cn;     yanmei.wei@us.icbc.com.cn;
amanat.yousaf@us.icbc.com.cn

\

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
CAPITAL ONE, NATIONAL ASSOCIATION**

Name: Michael P. Robinson
Title: Vice President


Address: 201 St. Charles Avenue, 18th Floor, New Orleans, LA 70170


E-mail address(es): michael.robinson@capitalone.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

## FS GLOBAL CREDIT OPPORTUNITIES FUND

## BY: FS GLOBAL ADVISORS, LLC, ITS INVESTMENT ADVISOR

Name: Scott Giardina
Title:    Managing Director

Address:       FS Investments

10 East 53rd Street, 20th Floor

NY, NY 10022

E-mail address(es):  Jan.Trnka-Amrhein@fsinvestments.com

\

SRF 40021

Consenting Stakeholder Signature Page to
the Restructuring Support Agreement
[CONSENTING STAKEHOLDER]

Name: ERIC R. ERNST
Title: SVP, Director of Special Assets for BOKF, NA

Address: BOKF, NA
One Williams Center, 125W
Tulsa, OK 74172
E-mail address(es): eernst@bokf.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**VENTURE XII CLO, Limited**
BY: its investment advisor
MJX Venture Management LLC


By: _____
Name: Frederick Taylor
Title: Managing Director




Address:


E-mail address(es):

\

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**VENTURE XIII CLO, Limited**
By: its Investment Advisor
 MJX Venture Management LLC


By: _____
Name: Frederick Taylor
Title: Managing Director




Address:


E-mail address(es):

\

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**VENTURE XIV CLO, Limited**
By: its investment advisor
 MJX Venture Management LLC


By: _____
Name: Frederick Taylor
Title: Managing Director




Address:


E-mail address(es):

\

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Venture XXI CLO, Limited**
By: its investment advisor
 MJX Venture Management LLC

By: _____
Name: Frederick Taylor
Title: Managing Director

Address:

E-mail address(es):

\

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Venture VII CDO Limited**
BY: its investment advisor, MJX Asset
Management, LLC


By: _____
Name: Frederick Taylor
Title: Managing Director




Address:


E-mail address(es):

\

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**RR 1 LTD**

By: Redding Ridge Asset Management, LLC, its collateral manager

Name: Joseph D. Glatt
Title:   Chief Legal Officer

Address: 9 West 57th Street, 37th Floor
 New York, NY 10019


E-mail address(es): glatt@rram.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ALM VII, LTD.**

By: Apollo Credit Management (CLO), LLC, its collateral manager

Name: Joseph D. Glatt
Title:   Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ALM VIII, LTD.**

By: Apollo Credit Management (CLO), LLC, its collateral manager

Name: Joseph D. Glatt
Title:   Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ALM VI, LTD.**

By: Apollo Credit Management (CLO), LLC, its collateral manager

Name: Joseph D. Glatt
Title:   Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ALM VII (R)-2, LTD.**

By: Apollo Credit Management (CLO), LLC, its collateral manager

Name: Joseph D. Glatt
Title:   Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ALM V, LTD.**

By: Apollo Credit Management (CLO), LLC, its collateral manager

Name: Joseph D. Glatt
Title:   Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**RR 3 LTD**

By: Redding Ridge Asset Management, LLC, its collateral manager

Name: Joseph D. Glatt
Title:   Chief Legal Officer

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): glatt@rram.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**RR 4 LTD**

By: Redding Ridge Asset Management, LLC, its asset manager

Name: Joseph D. Glatt
Title:   Chief Legal Officer

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): glatt@rram.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ALM XII, LTD.**

By: Apollo Credit Management (CLO), LLC, its collateral manager

Name: Joseph D. Glatt
Title:  Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

## APOLLO SENIOR FLOATING RATE FUND INC.

By: Apollo Credit Management, LLC, its investment manager

_____

Name: Joseph D. Glatt
Title:  Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**APOLLO TACTICAL INCOME FUND INC.**

By: Apollo Credit Management, LLC, its investment manager

_____

Name: Joseph D. Glatt
Title:   Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

## APOLLO CREDIT MASTER FUND LTD.

By: Apollo ST Fund Management, LLC, its investment manager

Name: Joseph D. Glatt
Title:   Vice President

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): jglatt@apollo.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**REDDING RIDGE ASSET MANAGEMENT LLC, C-MOA SERIES**

Name: Joseph D. Glatt
Title:   Chief Legal Officer

Address: 9 West 57th Street, 37th Floor
New York, NY 10019

E-mail address(es): glatt@rram.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**KINGSLAND VII**

**By Hayfin Capital Management LLC, its Collateral Manager**

_____  _____
Name:  Jeremy Delman
Title:   Authorized Signatory


Address:        c/o Hayfin Capital Management
                485 Madison Avenue, 24th Floor
                New York, NY 10022


E-mail address(es): GC@hayfin.com; Ops-NY@hayfin.com; Loanops@hayfin.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**HAYFIN KINGSLAND VIII, LTD.**

**By Hayfin Capital Management LLC, its Collateral Manager**

_____   _____

Name:  Jeremy Delman

Title:   Authorized Signatory


Address:          c/o Hayfin Capital Management
                  485 Madison Avenue, 24th Floor
                  New York, NY 10022


E-mail address(es): GC@hayfin.com; Ops-NY@hayfin.com; Loanops@hayfin.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**HAYFIN KINGSLAND IX, LTD.**

**By Hayfin Capital Management LLC, its Collateral Manager**

_____   _____
Name:  Jeremy Delman
Title:   Authorized Signatory


Address:          c/o Hayfin Capital Management
                  485 Madison Avenue, 24th Floor
                  New York, NY 10022


E-mail address(es): GC@hayfin.com; Ops-NY@hayfin.com; Loanops@hayfin.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**HAYFIN TOPAZ LUXCO 2 S.C.A.**

**By Hayfin Topaz S.à r.l., its Managing Shareholder**

_____

Name:  Lina Kavoliune
Title:   Authorized Signatory


Address:        c/o Hayfin Capital Management
                485 Madison Avenue, 24th Floor
                New York, NY 10022


E-mail address(es): GC@hayfin.com; Ops-NY@hayfin.com; Loanops@hayfin.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**HAYFIN SOF II LUXCO 2 S.À R.L.**

_____

Name:  Lina Kavoliune
Title:   Authorized Signatory


Address:        c/o Hayfin Capital Management
                485 Madison Avenue, 24th Floor
                New York, NY 10022


E-mail address(es): GC@hayfin.com; Ops-NY@hayfin.com; Loanops@hayfin.com

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**HAYFIN OPAL III LP**

**By Hayfin Opal III GP Limited, its general partner**

_____

Name:  Andrew Tingle
Title:   Authorized Signatory


Address:        c/o Hayfin Capital Management
                485 Madison Avenue, 24th Floor
                New York, NY 10022


E-mail address(es): GC@hayfin.com; Ops-NY@hayfin.com; Loanops@hayfin.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

AGF FLOATING RATE INCOME FUND
BY: EATON VANCE MANAGEMENT
AS PORTFOLIO MANAGER

Name:            Michael B. Botthof
Title:             Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

\

## Consenting Stakeholder Signature Page to
## the Restructuring Support Agreement

Brighthouse Funds Trust I -
Brighthouse/Eaton Vance Floating Rate Portfolio
By: Eaton Vance Management as Investment Sub-Advisor

Name:       Michael B. Botthof
Title:          Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

Eaton Vance Floating-Rate
Income Plus Fund
By: Eaton Vance Management
as Investment Advisor

Name:          Michael B. Botthot
Title:           Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

EATON VANCE SENIOR
FLOATING-RATE TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

Name:        Michael B. Botthof
Title:         Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

EATON VANCE FLOATING-RATE
INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

*Michael B. Botthof*

Name:       Michael B. Botthof
Title:        Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

Eaton Vance International
(Cayman Islands) Floating-Rate
Income Portfolio
By: Eaton Vance Management as
Investment Advisor

Name:            Michael B. Botthof
Title:            Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

EATON VANCE SENIOR INCOME TRUST
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

_Michael B. Botthof_

Name:           Michael B. Botthof
Title:           Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Eaton Vance Short Duration
Diversified Income Fund**
By: Eaton Vance Management
As Investment Advisor

_michael B. Batthof_

Name:           Michael B. Botthof
Title:               Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

EATON VANCE INSTITUTIONAL SENIOR LOAN FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

*Michael B. Botthof*

Name:        Michael B. Botthof
Title:        Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

EATON VANCE
LIMITED DURATION INCOME FUND
BY: EATON VANCE MANAGEMENT
AS INVESTMENT ADVISOR

_Michael B. Botthof_

Name:        Michael B. Botthof
Title:              Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Eaton Vance Floating Rate Portfolio**
By: Boston Management and Research
as Investment Advisor

_michael B. Botthof_

Name:        Michael B. Botthof
Title:        Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

SENIOR DEBT PORTFOLIO
By: Boston Management and Research
as Investment Advisor

*michael B. Botthof*

Name:           Michael B. Botthof
Title:            Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**Eaton Vance VT Floating-Rate Income Fund**
By: Eaton Vance Management
as Investment Advisor

Name:          Michael B. Botthof
Title:            Vice President

Address:
2 International Place
Boston MA 02110

E-mail address(es):
rpeepgass@eatonvance.com

**Consenting Stakeholder Signature Page to
the Restructuring Support Agreement**

**ALCOF II NUBT, L.P.
BY: ARBOUR LANE FUND II GP, LLC
ITS GENERAL PARTNER**



Name: Robert Franz
Title:   Manager

Address:  700 Canal Street, 4th Floor, Stamford, CT 06902

E-mail address(es):  18174899131@tls.ldsprod.com; kvandam@alcmlp.com

\

## EXHIBIT A

### Plan

Intentionally Omitted

**EXHIBIT B**

**Wind-Down Budget**

**Sheridan Fund I - TSA Wind Down Account Budget**
**As of February 13,2020**

| Category | Cost Estimate |
|---|---|
| Corporate Severance | $ 4,400,000 |
| Employee Compensation | $ 1,100,000 |
| **Total TSA Wind Down Estimate** | **$ 5,500,000** |

**Sheridan Fund I - TSA Wind Down Escrow Account Budget**
**As of February 13,2020**

| Category | Cost Estimate |
|---|---|
| Field Severance | $ 3,500,000 |
| Corporate Lease | $ 3,200,000 |
| Wind Down Professional and Other Expenses | $ 1,500,000 |
| Litigation Reserve | $ 6,000,000 |
| **Total TSA Wind Down Escrow Estimate** | **$ 14,200,000** |

**EXHIBIT C**

**Form of Transfer Agreement**

### *TRANSFER AGREEMENT*

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting Sheridan I RBL Lender" or a "Consenting Sheridan I Term Lender," under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this transfer agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Sheridan I RBL Claims | |
| Sheridan I Term Loan Claims | |

---

[1]   Capitalized terms not used but not otherwise defined in this transfer agreement shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT D

**Form of Joinder**

### *JOINDER*

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among the Company Parties and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting Sheridan I RBL Lender" or a "Consenting Sheridan I Term Lender" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Sheridan I RBL Claims | |
| Sheridan I Term Loan Claims | |

---

[1] Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

## Exhibit E

### ROFO (No More Restrictive Terms to Transferring Holder)

"**ROFO**" means a right of first offer to be set forth in the New Organizational Documents and acceptable to at least sixty-two percent (62%) of the Consenting Lenders pursuant to which a holder of New Sheridan Equity (such holder, the "**Transferring Holder**") must first make a written offer (the "**Offer Notice**") to sell the New Sheridan Equity intended to be transferred (such New Sheridan Equity, the "**Offered Interest**") to the existing holders of New Sheridan Equity pro rata to such holders' ownership of the New Sheridan Equity (such non-transferring holders, the "**Non-Transferring Holders**") at a specified price (such price, the "**Offered Price**"). The Non-Transferring Holders shall have five business days (the "**Offer Period**") upon receipt of the Offer Notice to accept the offer to purchase the Offered Interest at the Offered Price. If a Non-Transferring Holder accepts the offer to purchase the Offered Interest, such Non-Transferring Holder and the Transferring Holder shall have 20 business days to close the sale of the Offered Interest. If no Non-Transferring Holder accepts[1] the offer to purchase the Offered Interest prior to the expiration of the Offer Period, or if the sale of the Offered Interest does not timely close (a "**Failed Non-Transferring Holder Sale**"), then the Transferring Holder shall be permitted to transfer the Offered Interest at a price not lower than the Offered Price and on terms not more favorable than those offered to the Non-Transferring Holders and otherwise in accordance with the New Organizational Documents (such transfer, a "**Third Party Sale**"). If a Third Party Sale does not close within 25 business days of the expiration of the Offer Period (or within 25 business days after a Failed Non-Transferring Holder Sale, if applicable), such Transferring Holder shall be required to submit a new Offer Notice to the Non-Transferring Holders and otherwise comply with the right of first offer requirements set forth in the New Organizational Documents prior to any Third Party Sale; *provided* that such Transferring Holder shall not be permitted to submit a new Offer Notice to the Non-Transferring Holders until the first day of the subsequent fiscal quarter.

---

[1] If any Non-Transferring Holder does not wish to purchase its entire pro rata allocation of the Offered Interests, then all other Non-Transferring Holders who so elect shall have the right to accept such Offered Interests, on a pro rata basis with all other Non-Transferring Holders who so elect, such portion of the Offered Interests not purchased by such Non-Transferring Holder.

## Schedule 1

**Threatened or Pending Litigation**

Lists of lawsuits/regulatory investigations:

A.        Pending Matters:

1.   *Kyle Alan Taylor, on behalf of himself and all others similarly situated, Plaintiffs, v. Sheridan Production Company, LLC, Sheridan Production Partners I-A, L.P., Sheridan Production Partners I-M, L.P., and Sheridan Holding Company I, LLC, Defendants*, Case No. CIV-18-0029-SLP in the United States District Court for the Western District of Oklahoma; consolidated with *Tony R. Whisenant, Plaintiff, v. Sheridan Production Company, LLC, et al,* Case No. CIV-15-81-SLP in the United States District Court for the Western District of Oklahoma.

2.   *Stanley Ray Born and Ronda Jean Born, Plaintiffs vs. Sheridan Production Company, LLC, Defendant*, Case No. CJ-2012-47 in the District Court, Sixth Judicial District, Caddo County, Oklahoma.

3.   *Stamps Brothers Oil & Gas, LLC, Plaintiff v. Ward Petroleum Corporation, Sheridan Production Company, LLC, and Marathon Oil Company*, Case No. CV 2016-126 in the District Court of Grady County, Oklahoma.

4.   *Ray H. Potts, et al, vs. Continental Resources, Inc., Sheridan Production Partners I-A, L.P., Sheridan Production Partners I-M, L.P., and Sheridan Holding Company I, LLC, Cause No. CV-2019-151 in the District Court of Grady County, Oklahoma.*